CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
WASEEM SALAHI (Bar No. 325362)
ANTONIO VILLAAMIL (Bar No. 5205315)[1]
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
    waseem_salahi@fd.org
    antonio_villaamil@fd.org
    (213) 894-4748
    (213) 894-0081 FAX

Attorneys for Defendant
BRIESHANAY FORD

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| UNITED STATES OF AMERICA, | NO. 2:22-CR-200-PA |
|---|---|
| Plaintiff, | |
| | **NOTICE OF MOTION AND MOTION TO DISMISS FOR VINDICTIVE PROSECUTION, VINDICTIVE ENFORCEMENT, SELECTIVE ENFORCEMENT; MOTION TO COMPEL DISCOVERY; APPENDIX A; DECLARATIONS; EXHIBITS 1–5** |
| v. | |
| BRIESHANAY FORD, | |
| Defendant. | |

DATE: Sept. 6, 2022
TIME: 3:00 p.m.

PLEASE TAKE NOTICE that on September 6, 2022, or as soon as may be heard, in the courtroom of the Honorable Percy Anderson, the defendant, Brieshanay Ford, will move for an order dismissing the Indictment, or, in the alternative, and order to compel discovery and to hold an evidentiary hearing.

//

---

[1] As a government attorney and a member of the New York State Bar, Antonio Villaamil has been admitted to practice before the United States District Court for the Central District of California.

1

1    This Motion is based on the memorandum of points and authorities, declarations,

2    exhibits, and all other records in this case.

3

4                                              Respectfully submitted,

5                                              CUAUHTEMOC ORTEGA
                                               Federal Public Defender
6

7
     DATED:  August 15, 2022                   */s/ Antonio Villaamil*
8                                              _____
                                               ANTONIO VILLAAMIL
9                                              WASEEM SALAHI
                                               Deputy Federal Public Defenders
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              2

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................ 1

II.    FACTUAL BACKGROUND ......................................................................... 2

    A.    Detective Vinton threatens Ms. Ford with federal prosecution during an unrelated interrogation. ................................................................. 2

    B.    SA Corcoran heeds Detective Vinton's threats and begins to investigate Ms. Ford. ........................................................................ 4

    C.    SA Corcoran arrests Ms. Ford and interrogates her about the homicide with Detective Vinton. ..................................................................... 6

    D.    Detective Vinton has a longstanding history of misconduct. .................. 6

    E.    The government asks Ms. Ford to assist in the homicide investigation. ..... 8

    F.    Detective Vinton confirms that he was using the federal process to obtain information from Ms. Ford. ......................................................... 12

    G.    The government refused to provide any information about these facts..... 13

III.   ARGUMENT ........................................................................................... 13

    A.    The government's conduct was vindictive. .......................................... 13

        1.    Legal background ...................................................................... 13

        2.    The government violated Ms. Ford's due process rights. .............. 19

    B.    The government's conduct was outrageous. ....................................... 22

    C.    The government selectively enforced the law. .................................... 24

        1.    Discriminatory purpose............................................................ 24

        2.    Discriminatory effect ............................................................... 25

    D.    This Court should compel discovery in support of Ms. Ford's claims...... 25

IV.    CONCLUSION ........................................................................................ 27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adamson v. Ricketts*,
    865 F.2d 1011 (9th Cir. 1988) ................................................................ 26

*Blackledge v. Perry*,
    417 U.S. 21, 22–23 (1974). ................................................................ 14

*Bordenkircher v. Hayes*,
    434 U.S. 357 (1978) ................................................... 15, 17, 18, 19

*Carrington v. City of L.A.*,
    No. 2:01-cv-07432-GAF-AJWX (C.D. Cal. 2001) .................................... 7

*Corrales v. City of L.A.*,
    No. 2:03-cv-00910-GAF-AJWX (C.D. Cal. 2003) .................................... 7

*Edwards v. Arizona*,
    451 U.S. 477 (1981) ................................................................ 19

*Godinez v. City of L.A.*,
    No. 2:00-cv-08962-GAF-AJWX (Aug. 23, 2000) .................................... 7

*Greene v. United States*,
    454 F.2d 783 (9th Cir. 1971) ................................................................ 23

*Guerrero v. Gates*,
    2:00-cv-07165-GAF-AJWX (C.D. Cal. 2000) .................................... 7

*Heck v. Humphrey*,
    512 U.S. 477 (1994) ................................................................ 7, 8

*Herrera v. City of L.A.*,
    No. 2:00-cv-12531-GAF-AJW (C.D. Cal. 2000) .................................... 7

*Humphrey v. City of L.A.*,
    No. 2:03-cv-02623-DDP-FMO (C.D. Cal. 2003) .................................... 7

*Lacey v. Maricopa Cty.*,
    693 F.3d 896 (9th Cir. 2012) (en banc) ...................................... 18, 24

ii

*Miranda v. Arizona*,
    384 U.S. 436 (1966) ................................................................... 20, 23

*Moore v. City of L.A.*,
    No. 2:02-cv-05355-GAF-AJWX (C.D. Cal. 2002) ....................................... 7

*North Carolina v. Pearce*,
    395 U.S. 711 (1969) ........................................................................... 14

*Rivas v. Gates*,
    2:00-cv-07207-GAF-AJWX (C.D. Cal. 2000) ............................................ 7

*Rochin v. California*,
    342 U.S. 165 (1952) ........................................................................... 22

*Rodriguez v. City of L.A.*,
    No. 2:00-cv-09218-GAF-AJWX (C.D. Cal. 2000) ...................................... 7

*Tenorio v. City of L.A.*,
    No. 2:00-cv-00065-GAF-AJW (C.D. Cal. 2000) ........................................ 7

*Tenorio v. City of L.A.*,
    No. 2:00-cv-06177-GAF-AJWX (C.D. Cal. 2000) ...................................... 7

*United States v. Armstrong*,
    517 U.S. 456 (1996) ................................................................... 24, 26

*United States v. Black*,
    733 F.3d 294 (9th Cir. 2013) ....................................................22, 23, 24

*United States v. DeMarco*,
    550 F.2d 1224 (9th Cir. 1977) ........................................................*passim*

*United States v. Gilbert*,
    266 F.3d 1180 (9th Cir. 2001) ...............................................17, 18, 22

*United States v. Goodwin*,
    457 U.S. 368 (1982) ................................................................... 17, 18

*United States v. Hollywood Motor Car Co., Inc*,
    646 F.2d 384 (9th Cir. 1981) ...............................................15, 18, 20

*United States v. Jenkins*,
    504 F.3d 694 (9th Cir. 2007) ...........................................16, 17, 18, 21

iii

*United States v. Koh,*
    199 F.3d 632 (2d Cir. 1999) ........................................................... 17, 18, 21

*United States v. Meyer,*
    810 F.2d 1242 (D.C. Cir.) ............................................................... 18

*United States v. One 1985 Mercedes,*
    917 F.2d 415 (9th Cir. 1990) ........................................................... 26

*United States v. Russell,*
    411 U.S. 423 (1973) ....................................................................... 22

*United States v. Sanders,*
    211 F.3d 711 (2d Cir. 2000) ........................................................... 17

*United States v. Sellers,*
    906 F.3d 848 (9th Cir. 2018) ................................................ 10, 18, 24, 26

*United States v. Stinson,*
    647 F.3d 1196 (9th Cir. 2011) ......................................................... 20

*United States v. Twigg,*
    588 F.2d 373 (3d Cir.1978) ............................................................. 23

*Wayte v. United States,*
    470 U.S. 598 (1985) ....................................................................... 24

**State Cases**

*Padilla v. City of L.A.,*
    No. 2:02-cv-05641-PA-EX (C.D. Cal. 2002) .............................................. 7

**Federal Statutes**

18 U.S.C. § 922(g) .................................................................................. 11

**State Statutes**

California Penal Code § 1385 ....................................................................... 7

**Other Authorities**

Gary C. Williams, *Incubating Monsters?: Prosecutorial Responsibility for
    the Rampart Scandal,* 34 Loy. L.A. L. Rev. 829, 831 (2001) ................................ 6, 8

Matt Lait and Scott Glover, *DNA Evidence in 4 Drug Cases Refutes Officers*, L.A. TIMES (Apr. 26, 2000), https://www.latimes.com/archives/la-xpm-2000-apr-26-mn-23499-story.html ................................................................................... 6, 8

U.S. Const. amend. V ...................................................................... *passim*

## POINTS & AUTHORITIES

### I.   INTRODUCTION

> "You see?  I told you this was going to happen. . . .
> You have one more chance to tell us who did it."
>
> *— LAPD Detective David Vinton*

In November 2021, local police pulled Ms. Ford over during a traffic stop, searched her, and allegedly found her carrying a firearm.  She spent the next five months resolving charges stemming from that incident in state court.

But today, she is in federal court facing charges for that conduct.  The government, of course, routinely brings firearms charges even after proceedings have already begun in state court, but this case, unlike other referrals that pass through this district, did not undergo the normal and legitimate channels for federal prosecution.  Ms. Ford isn't here because local prosecutors referred her case for federal prosecution.  Nor is she here because the government came across her state case and believed that state prosecution alone would fail to serve the interests of justice.

Ms. Ford is here because one officer decided to punish her for exercising her constitutional rights—and the government colluded with him along the way.  In December 2021, that officer tried to interrogate Ms. Ford in a separate, unrelated investigation, but she immediately invoked her right to remain silent and asked for an attorney.  Instead of stopping questioning—as he was legally required to do—the officer threatened Ms. Ford.  He told her that he knew about her pending gun charges and would leverage his connections in the federal government to have more serious gun charges brought against her.  He threatened that federal charges would result in a much longer prison sentence than her state case.  Ms. Ford continued to invoke her rights, as was her right, and, the officer, who has an egregious history of misconduct, followed through on his threats.  And here we are now.

1

The due process and equal protection guarantees forbid the government from retaliating against people who choose to invoke them.  Ms. Ford is the victim of vindictive prosecution, vindictive enforcement, and outrageous government conduct. She also raises a credible selective enforcement claim.  This Court should intervene to send a strong message that such conduct has no place in the criminal justice system. The attached affidavits and exhibits provide ample evidence to grant Ms. Ford's motion to dismiss for these serious due process and equal protection violations.  But if this Court believes additional facts are necessary, Ms. Ford respectfully requests this Court grant her motion to compel discovery in support of her due process and equal protection claims.  She also respectfully asks this Court to grant an evidentiary hearing to afford her the opportunity to question various witnesses who participated in bringing federal charges against her.

## II.    FACTUAL BACKGROUND

### A.    Detective Vinton threatens Ms. Ford with federal prosecution during an unrelated interrogation.

On November 23, 2021, local authorities arrested Ms. Ford for the alleged possession of a firearm, the same conduct for which she is being charged now.

As those charges were pending in state court, on December 14, 2021, Los Angeles Police Department officers executed a search warrant on Ms. Ford's home and arrested her on suspicion of homicide.  The officers transported Ms. Ford to the precinct and handcuffed her to the table.  (Declaration of Brieshanay Ford, ¶¶ 6–7.) Detective Vinton and his partner sat across from her and interrogated her.  (*Id.* ¶ 8.) Detective Vinton showed Ms. Ford photographs of a man and informed her that he had been murdered.  (*Id.*)  Ms. Ford asked Detective Vinton, "What does this have to do with me?"  (*Id.* ¶ 9.)  Detective Vinton responded, "We're charging you with it."  (*Id.* ¶ 10.)

Ms. Ford told Detective Vinton that she did not want to speak with them anymore and demanded to have a lawyer present.  (*Id.* ¶ 11.)  Rather than cease

2

questioning, as he was legally required to do, Detective Vinton asked, "What do you need a lawyer for?" (*Id.*) Detective Vinton persisted, showing Ms. Ford more photographs and questioning her about the people portrayed. (*Id.* ¶ 13.) Ms. Ford was crying, shaking her head, and asking repeatedly for a lawyer. (*Id.* ¶ 14.)

Detective Vinton paused the questioning but eventually brought Ms. Ford back into the interrogation room for a second round of questioning. (*Id.* ¶ 15.) Once again, Ms. Ford immediately told Detective Vinton that she wanted to have a lawyer present and did not want to speak with him, but he ignored her and continued questioning her. (*Id.*) Eventually, Detective Vinton told Ms. Ford that he would be charging her with murder and drove her to another jail facility for processing. (*Id.* ¶¶ 15–16.) Detective Vinton escorted Ms. Ford into the back of his car and drove her to the jail. During the entire car ride, Detective Vinton continued to ask Ms. Ford questions. (*Id.* ¶ 17.) When they arrived at the jail, Detective Vinton escorted Ms. Ford to get processed. (*Id.* ¶ 18.)

After multiple, repeated failed attempts to have Ms. Ford waive her Fifth Amendment rights, Detective Vinton threatened her. (*Id.* ¶¶ 20–22.) He told her that he knew she had a pending state charge for possessing a firearm, and if she insisted on remaining silent, he would contact a "friend" at the Federal Bureau of Investigation who would upgrade her state case into a federal one. (*Id.* ¶ 22.) Detective Vinton warned Ms. Ford that she would be facing much more prison time if the charges became federal. (*Id.* ¶ 21.)

As Detective Vinton threatened Ms. Ford, he showed her his cellphone. (*Id.* ¶ 23.) He explained that he was texting his friend at the FBI at that moment. (*Id.*) Ms. Ford read a text message conversation, happening in real time, with a person saved in Detective Vinton's phone as "Sarah." (*Id.*)[2] Detective Vinton asked "Sarah" to look into Ms. Ford and explore the possibility of filing federal criminal charges against her.

---

[2] The arresting case agent in this case is FBI Special Agent Sarah Corcoran.

(*Id.*)  "Sarah" responded, asking if the gun in question was the one used for Detective Vinton's homicide investigation, and Detective Vinton replied, "No."  (*Id.* ¶ 24.) Detective Vinton emphasized that if Ms. Ford would simply answer his questions, he would not refer her case to the FBI.  (*Id.*)  Still, Ms. Ford refused to speak, as was her right.  (*Id.* ¶ 26.)

Ms. Ford remained in jail for the next two days.  (*Id.* ¶ 27.)  During that time, she never saw a judge; she never saw an attorney.  (*Id.*)  Before her initial appearance, the local district attorney declined to file homicide charges, and she was finally released on December 16, 2021.  (*Id.* ¶ 28; Ex. 1, at Bates 212 (dismissing murder charge for "detention only — lack of sufficient evidence").)[3]  The police retained her cellphone. (*See* Exs. 2–3; Ford Decl. ¶ 28.)

**B.    SA Corcoran heeds Detective Vinton's threats and begins to investigate Ms. Ford.**

Consistent with Detective Vinton's threats, on January 10, 2022, FBI Special Agent Sarah Corcoran began pulling records on Ms. Ford and building a federal criminal prosecution against her.  SA Corcoran ran searches on Ms. Ford through various databases, reviewed her criminal history, and verified that Ms. Ford qualified for federal prosecution.  (*See* Ex. 1, at Bates 177–240; Ex. 4, at Bates 327.)

Over the next few weeks, Detective Vinton continued to harass Ms. Ford.  (Ford Decl. ¶ 29; Declaration of Alan Fenster, ¶¶ 3–6.)  Detective Vinton's persistence prompted Ms. Ford to inform her counsel, who represented her on an unrelated matter, about her fears regarding Detective Vinton.  (Fenster Decl. ¶¶ 3–6.)  On March 22, 2022, Detective Vinton contacted Ms. Ford to retrieve her cell phone from the police station, which he had retained since her arrest.  (Ex. 2.)  The next night, on March 23,

---

[3] Defense counsel believes that, given the strange circumstances of her homicide arrest and interrogation, the arrest was without probable cause and served as a pretextual way to get Ms. Ford into an interrogation room.  As both the Assistant United States Attorney assigned to this case and Detective Vinton have since acknowledged, Ms. Ford is no longer deemed an actual suspect in that investigation. (*See* Declaration of Counsel ¶¶ 8–9; Jawetz Decl. ¶ 4.)

1  2022, Detective Vinton texted Ms. Ford, stating, "Can you try and find that dudes
2  Instagram account." (*Id.*)  Ms. Ford did not respond.  (Ford Decl. ¶ 31; Ex. 2.)

3       Just seven days after Ms. Ford ignored Detective Vinton's text message, on
4  March 30, 2022, SA Corcoran sought and received an arrest and search warrant.  (Ex.
5  4, at Bates 304–34.)  The search warrant, which purportedly served to collect evidence
6  for the federal offense, was extremely broad and permitted the search of Ms. Ford's
7  digital device and for all "call log information," "contents of any calendar or date
8  book," and "Global Positioning System coordinates" and other location data—all of
9  which could be seized regardless of whether they related to the alleged federal
10 violation.  (*See* Ex. 4, at Bates 316–17, ¶¶ 1(b), (g), (h).)[4]  This warrant appears to have
11 been a pretextual means for SA Corcoran to gain access to Ms. Ford's phone to benefit
12 Detective Vinton's homicide investigation.  It is clear from text message
13 correspondence that Detective Vinton wanted to access Ms. Ford's phone and believed
14 that the federal search warrant, which authorized SA Corcoran to bypass the phone's
15 password by using Ms. Ford's biometric data, would enable him to access evidence of
16 the alleged homicide and, specifically, her social media accounts and messages.  (*See*
17 *id.*, at Bates 307, 332–33; Exs. 2–3.)

18      On the same day SA Corcoran sought and received this search warrant, Detective
19 Vinton made a last-ditch effort to extract information from Ms. Ford, despite her clear
20 invocation of her Fifth Amendment rights.  (Ford Decl. ¶ 32; Exs. 2–3.)  He texted her,
21 urging her once again to "try and find that dudes Instagram account."  (*Ids.*)  He texted
22 again, falsely promising, "I want to clear your name."  (*Ids.*)  Ms. Ford continued to
23 ignore him.  (*Ids.*)

24
25
26

———————————————

27     [4] Besides its sheer breadth, the warrant made no meaningful attempt to explain
how a digital device, seized *five months* after the alleged offense, would still contain
28 evidence of firearm possession.  In any event, it appears this warrant was never
executed.

## C.    SA Corcoran arrests Ms. Ford and interrogates her about the homicide with Detective Vinton.

Shortly after Ms. Ford ignored Detective Vinton's repeated entreaties to "try and find that dudes Instagram account," on April 21, 2022, while Ms. Ford appeared in state court on the local gun case, SA Corcoran arrested Ms. Ford.  (Ford Decl. ¶ 33.)  SA Corcoran escorted Ms. Ford from the state courthouse to a nearby building, where she placed Ms. Ford into a holding area.  (*Id.* ¶ 34.)  Inside that area, among others, was Detective Vinton.  (*Id.* ¶ 35.)  Together, SA Corcoran and Detective Vinton interrogated Ms. Ford—not about the firearms charge for which she had just been arrested, but instead about Detective Vinton's homicide investigation.  (*Id.* ¶ 36.)  Detective Vinton told Ms. Ford, while SA Corcoran was present, "You have one more chance to tell us who did it."  (*Id.*)  As before, Ms. Ford refused to answer questions.  (*Id.*)  She began to cry.  (*Id.* ¶ 37.)  Detective Vinton told her, "You see?  I told you this was going to happen."  (*Id.*)  The government has not produced a recording of this interrogation, and it remains unclear whether it was ever recorded.  (In a conversation with defense counsel, Detective Vinton denied being present during Ms. Ford's federal arrest, (Jawetz Decl. ¶ 4), and the government has declined to answer defense counsel's repeated questions about whether he was present.)

## D.    Detective Vinton has a longstanding history of misconduct.

Detective Vinton's actions here, while outrageous and unconstitutional, are unfortunately consistent with his long, documented history of violating the due process rights of those who come within his midst.  His wrongdoing has been detailed at length in law review articles[5] and news stories.[6]  He was famously involved in the Rampart scandal, which involved widespread police corruption in the late 1990s, and has a

---

[5] *See, e.g.*, Gary C. Williams, *Incubating Monsters?: Prosecutorial Responsibility for the Rampart Scandal,* 34 Loy. L.A. L. Rev. 829, 831 (2001).

[6] Matt Lait and Scott Glover, *DNA Evidence in 4 Drug Cases Refutes Officers*, L.A. TIMES (Apr. 26, 2000), https://www.latimes.com/archives/la-xpm-2000-apr-26-mn-23499-story.html.

documented history of falsifying and planting evidence.[7]  And Detective Vinton has also been a named defendant in at least eleven lawsuits for violating people's civil and constitutional rights in this district.[8]  In fact, seven of those cases were settled out of court (and two were procedurally barred under Supreme Court precedent).

Of the filings defense counsel was able to access,[9] several allege extremely disturbing, but consistent, conduct.  For instance, in *Humphrey*, the plaintiff alleged the then-officer Vinton violently kicked open the plaintiff's motel door, causing him to fall and injure his knee, and then entered his room without a warrant.  Dkt. No. 48, No. 2:03-cv-02623, at *3.  The plaintiff, who was unclothed, was handcuffed and interrogated about gang and drug activities.  *Id.*  Vinton did not advise the plaintiff of his rights; he removed a packet of drugs from his own pocket and asked plaintiff for information regarding the drugs.  *Id.*  After the plaintiff was unable to provide information, Vinton and his partner searched the motel room for drugs and took and destroyed property.  *Id.*  The trial court dismissed one of the controlled substance charges under California Penal Code § 1385 (though the basis for that dismissal was

---

[7] *Id.*

[8] *See, e.g., Tenorio v. City of L.A.*, No. 2:00-cv-00065-GAF-AJW (C.D. Cal. 2000) (dismissed pursuant to settlement Dec. 18, 2000); *Tenorio v. City of L.A.*, No. 2:00-cv-06177-GAF-AJWX (C.D. Cal. 2000) (dismissed pursuant to settlement Dec. 18, 2000); *Guerrero v. Gates*, 2:00-cv-07165-GAF-AJWX (C.D. Cal. 2000) (dismissed pursuant to settlement Oct. 16, 2006); *Rivas v. Gates*, 2:00-cv-07207-GAF-AJWX (C.D. Cal. 2000) (dismissed pursuant to settlement Mar. 7, 2005); *Godinez v. City of L.A.*, No. 2:00-cv-08962-GAF-AJWX (Aug. 23, 2000) (dismissed without prejudice Mar. 22, 2001 under *Heck*); *Rodriguez v. City of L.A.*, No. 2:00-cv-09218-GAF-AJWX (C.D. Cal. 2000); *Herrera v. City of L.A.*, No. 2:00-cv-12531-GAF-AJW (C.D. Cal. 2000) (dismissed due to plaintiff counsel's failure to oppose a motion to dismiss on Jun. 24, 2002); *Carrington v. City of L.A.*, No. 2:01-cv-07432-GAF-AJWX (C.D. Cal. 2001) (dismissed pursuant to settlement May 4, 2005); *Moore v. City of L.A.*, No. 2:02-cv-05355-GAF-AJWX (C.D. Cal. 2002) (dismissed pursuant to parties' stipulation Mar. 4, 2004); *Padilla v. City of L.A.*, No. 2:02-cv-05641-PA-EX (C.D. Cal. 2002) (dismissed pursuant to settlement Feb. 27, 2003); *Corrales v. City of L.A.*, No. 2:03-cv-00910-GAF-AJWX (C.D. Cal. 2003) (dismissed pursuant to settlement Mar. 17, 2005); *Humphrey v. City of L.A.*, No. 2:03-cv-02623-DDP-FMO (C.D. Cal. 2003) (dismissed under *Heck* on May 14, 2004).

[9] Given the age of the cases, defense counsel was required to obtain complaints and substantive filings from court archives.  Despite diligent efforts to obtain these materials, those materials are still being sought.  (Counsel Decl. ¶¶ 12–13.)

7

unclear).  *Id.* at *5.  The plaintiff's case, however, was procedurally barred from reaching the merits under *Heck v. Humphrey*, 512 U.S. 477, 487 (1994).

As evidence of Detective Vinton's misconduct came to light, even local prosecutors called his credibility into doubt.  According to an article published in the *Los Angeles Times*, one prosecutor called Detective Vinton's actions "extremely reckless," and stated that, during an internal investigation, his attitude "was so bad that quite frankly it was as if he were lying."[10]  During that same internal investigation, Detective Vinton provided a particularly illuminating insight into his law enforcement philosophy.  He lamented to one district attorney that "[the district attorney] and the LAPD were doing things the old way and didn't understand the way things had to be done to catch these gangbangers."[11]

Detective Vinton's philosophy to do things the way that he believed they "had to be done"—even if those ways were unethical and unconstitutional—apparently extends to the present.

E.    **The government asks Ms. Ford to assist in the homicide investigation.**

During Ms. Ford's federal arrest, SA Corcoran seized her phone, and, shortly thereafter, Assistant United States Attorney Lynda Lao asked defense counsel to voluntarily provide her with the password to access it.  (Counsel Decl. ¶ 5.)  On a June 10, 2022 phone call, AUSA Alexander Su reiterated that request.  (*Id.* ¶ 7.)  Defense counsel declined to provide access.  (*Id.*)

During the same June 10, 2022 phone call, AUSA Su asked defense counsel if Ms. Ford would be interested in proffering information to the government regarding the murder she was arrested for in December 2021, the same homicide that was the subject of Detective Vinton's investigation.  (*Id.* ¶ 8.)  In a conversation with defense counsel, AUSA Su conceded that the homicide had no federal nexus.  (*Id.* ¶ 10.)  He further

---

[10] *Incubating Monsters*, *supra*, at 831 (internal citations omitted).

[11] *DNA Evidence in 4 Drug Cases Refutes Officer*, *supra*.

8

stated that the government did not view Ms. Ford as a suspect in the homicide.  (*Id.* ¶ 9.)

Defense counsel and the government conferred by email and over the phone over the next few days about the government's interest in having Ms. Ford provide information about the homicide.  Given the strange circumstances around the government's interest in obtaining information about an unrelated state matter, and after defense investigation revealed the potential existence of a due process or equal protection violation, on June 23, 2022, defense counsel submitted a discovery request to the government, seeking production of:

- Audio recordings of Ms. Ford's interrogations after her Dec. 14 arrest;

- Audio recordings between Ms. Ford and any jailhouse informants that the LAPD placed in Ms. Ford's cell;

- A copy of the affidavit supporting probable cause for Ms. Ford's Dec. 14 arrest and the search of her residence and/or personal property;

- Copies of all transportation logs showing where Ms. Ford was placed between Dec. 14 and Dec. 16;

- Copies of surveillance footage depicting Ms. Ford providing buccal swabs after the Dec. 14 arrest;

- Copies of all communications between Detective Vinton (or any other law enforcement officer) and any local district attorney who was involved in Ms. Ford's Dec. 14 arrest;

- Police reports implicating Ms. Ford in the alleged homicide; and

- Body camera footage of all interactions with Ms. Ford during and after her Dec. 14 arrest.

(*Id.* ¶ 14.)

Defense counsel also asked the government to instruct whether Detective Vinton or any other law enforcement officer was present with SA Corcoran or any other federal agent during Ms. Ford's federal arrest on the instant criminal case, and to

9

produce any records from that arrest, like audio recordings or body camera footage, if they existed.  (*Id.*)

On July 15, 2022, the government informed defense counsel that it would not be producing the requested documents.  It also declined to answer whether Detective Vinton was present during Ms. Ford's federal arrest.  The government nonetheless invited defense counsel to provide caselaw in support of its request.  (*Id.* ¶ 15.)

On August 5, 2022, defense counsel sent the government a letter that extensively outlined these facts and how Detective Vinton's conduct and the federal prosecution raised serious due process and equal protection concerns.  (*Id.* ¶ 16; Ex. 5.)  The letter sought dismissal, but, in the alternative, renewed its prior discovery request to support Ms. Ford's due process and equal protection claims.  Defense counsel further added an item seeking policies from the United States Attorney's Office and federal law enforcement on accepting referrals from local law enforcement agencies for federal prosecution.  (Counsel Decl. ¶ 16; Ex. 5, at 6.)

In a phone call, AUSA Su agreed that defense counsel's letter raised "serious allegations" but conveyed that his office had not reached a final decision with respect to our proposed resolution or discovery demand.  (Counsel Decl. ¶ 17.)  Over the next few days, as defense counsel contemplated additional discovery materials in support of a selective enforcement claim, defense counsel requested the following items, which he explained were discoverable under *United States v. Sellers*, 906 F.3d 848, 855 (9th Cir. 2018):

- A list of all persons referred to the USAO for federal prosecution by Detective Vinton;

- A list of all persons interrogated by Detective Vinton;

- A list of all persons interrogated by Detective Vinton in connection with the homicide at issue here;

10

- A list of all persons the LAPD arrested and interrogated who would have qualified for federal prosecution under 18 U.S.C. section 922(g) but were not referred for federal prosecution;

- A list of all persons the LAPD arrested and interrogated who would have qualified for federal prosecution under section 922(g) and were in fact referred for federal prosecution;

- LAPD policies on making referrals for federal prosecution; and

- LAPD policies and recommended procedures following an interrogated person's invocation of their Fifth and Sixth Amendment rights.

The following day, defense counsel posed the following inquiries:

- Why did AUSA Lynda Lao seek an arrest warrant on the same day that Detective Vinton sent Ms. Ford a text message suggesting that he wanted to "clear her name"?

- What time was the complaint emailed to Magistrate Judge MacKinnon? What time did he sign it?

- What is the USAO's policy on seeking a complaint versus a grand jury indictment? Why did the USAO pursue this case by complaint rather than indictment?

- What is the genesis of Detective Vinton and Agent Corcoran's relationship? When and how did they meet?

- Please produce all written communications by any party at the USAO relating to the charging decision in this case.

(*Id.* ¶ 18.)

On August 12, 2022, the government informed defense counsel that it intended to proceed with Ms. Ford's prosecution but did not explain why. (*Id.* ¶ 19.) It further declined to provide any discovery for the same reasons stated in its July 15, 2022 letter. (*Id.*)

11

**F.      Detective Vinton confirms that he was using the federal process to obtain information from Ms. Ford.**

On August 12, 2022, defense counsel spoke with Detective Vinton about this case.  Detective Vinton confirmed that he questioned Ms. Ford about a homicide investigation following her arrest.  (Declaration of Ryan Jawetz, ¶ 4.)  He further confirmed that he had told Ms. Ford "many times" that he was interested in speaking with her.  (*Id.*)  Defense counsel asked Detective Vinton whether he told the government about Ms. Ford's pending gun case in state court.  (*Id.* ¶ 5.)  Detective Vinton stated there were twenty detectives in his unit, so he could not remember who referred her case for federal prosecution.  (*Id.*)

Detective Vinton confirmed that he knew SA Corcoran, but denied serving on a task force with her.  (*Id.*)  Defense counsel asked Detective Vinton whether he called or messaged SA Corcoran during his conversation with Ms. Ford, and Detective Vinton said he could not remember but that it was possible.  (*Id.*)  After being asked whether it was normal for him to refer gun cases for federal prosecution, Detective Vinton replied that he did not investigate gun cases.  (*Id.* ¶ 6.)  Defense counsel asked whether Detective Vinton had ever referred a gun case to the FBI before, and Detective Vinton said, in a general fashion, that it was not rare to refer cases to the FBI, but did not state whether he had ever done so.  (*Id.*)

Finally, defense counsel asked Detective Vinton whether he referred Ms. Ford's gun case to the government in order to have her provide information in the murder investigation.  (*Id.*)  Detective Vinton replied that he hoped she would cooperate, and that he had hoped she would have done so from the day she was arrested.  (*Id.*)

After asking whether Detective Vinton had authored an affidavit to arrest Ms. Ford, he said he could not recall but suggested that the best way to get any records associated with the case would be to serve a subpoena.  (*Id.* ¶ 7.)  Today, a member of the defense team served a subpoena on the LAPD, requesting this information, among

12

1    others the government said was not in its possession, with a return date of September 6,

2    2022.[12]

3    **G.    The government refused to provide any information about these facts.**

4         In one last effort, on August 13, 2022, defense counsel emailed the government

5    asking why it would not answer whether Detective Vinton was present during

6    Ms. Ford's federal arrest.  (Counsel Decl. ¶ 20.)  Defense counsel further asked whether

7    the government had asked SA Corcoran if she knew about Detective Vinton's motives

8    for referring Ms. Ford's case for federal prosecution.  (*Id.*)  Defense counsel explained

9    that it was unclear why the government would not be transparent with this information

10   if the government believed it had not engaged in any wrongdoing.  (*Id.*)  At the time of

11   this filing, the government has not responded.  (*Id.*)

12                          **III.   ARGUMENT**

13        These facts raise serious due process and equal protection concerns.  Together,

14   they show that Ms. Ford has been a target of vindictive prosecution and enforcement,

15   outrageous government conduct, and selective enforcement.  And, at a minimum, they

16   provide sufficient grounds to pursue additional discovery in support of these claims.

17   **A.    The government's conduct was vindictive.**

18        **1.    Legal background**

19        Due process is the foundation of the U.S. criminal justice system.  Vindictiveness

20   at any level—whether it is inflicted by a judge, prosecutor, or law enforcement

21   officer—violates one's right to due process.  Because, generally, vindictiveness claims

22   are brought against prosecutors, the majority of claims begin and end with the

23   prosecutor's decision to bring or add new charges against a defendant.  But this case

24   presents a blended claim where the vindictiveness began with a police officer's explicit

25   threats, the police officer acted on those threats, and the government—either knowingly

26

27

28
───────────────────────
         [12] After the telephone call with Detective Vinton, which occurred last Friday,
defense counsel prepared a subpoena and attempted to serve it on the LAPD's
discovery unit that afternoon, but unfortunately, it was closed.  (Jawetz Decl. ¶ 9.)

                              13

or with reckless disregard for the truth—actively joined or became an unwitting participant in the officer's vindictive endeavors.  It is thus helpful to provide a brief overview of how the doctrine developed historically, and how courts have contemplated its application when law enforcement vindictiveness taints the overall prosecution.

The doctrine against vindictiveness originally arose to prevent judicial vindictiveness—*i.e.*, to protect defendants who successfully appealed convictions.  *North Carolina v. Pearce*, 395 U.S. 711, 726 (1969).  For instance, in *Pearce*, the Supreme Court held that due process prohibits a state court judge from imposing a heavier sentence on a defendant who successfully appeals a conviction.  *Id.* at 723–24.  Not only does that kind of retaliation "flagrant[ly] violat[e]" a person's rights, the Court determined, but any other rule "may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack" a conviction, and "due process . . . requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge." *Id.* at 725.  Thus, part of the vindictiveness inquiry requires courts to consider the chilling impact that the retaliatory action may have in future cases.

The Supreme Court reinforced *Pearce*'s holding a few years later in *Blackledge v. Perry*, where the defendant was convicted of misdemeanor assault, exercised his right to trial de novo, and then was charged with felony assault based on the same conduct.  417 U.S. 21, 22–23 (1974).  The Court held that a person "is entitled to pursue his statutory right to a trial *de novo*, without apprehension that the State will retaliate by substituting a more serious charge for the original one."  *Id.* at 28.  *Blackledge* emphasized that dismissal was required, even absent "evidence that the prosecutor in this case acted in bad faith or maliciously," because the appearance of vindictiveness would chill the right to pursue the statutory right.  *Id.*

Drawing from this precedent, the Supreme Court easily recognized that the doctrine against vindictiveness not only binds judges, but prosecutors, too.

14

*Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).  In *Bordenkircher*, the Court

ultimately held that vindictiveness is harder to prove in the plea negotiation process,

because that system provides "mutual[] . . . advantage[s]" for both prosecutors and

defendants, and, even if a prosecutor threatens additional charges to induce a guilty

plea, defendants are represented by competent counsel during that process and can

make decisions understanding the full risks behind them.  *Id.* at 363–64.  Still, the

Court recognized there are "undoubtedly constitutional limits" upon prosecutorial

discretion in other contexts.  *Id.* at 365.  The Court stated that it is "the most basic" kind

of due process violation "[t]o punish a person because he has done what the law plainly

allows him to do," and it is "patently unconstitutional" "for an agent of the State to

pursue a course of action whose objective is to penalize a person's reliance on his legal

rights."  *Id.* at 363 (internal citation and quotation marks omitted).

Thus, outside the context of standard plea bargaining, courts of appeals have

readily found due process violations when prosecutors have explicitly retaliated—or

even engaged in the appearance of retaliation—against a defendant for exercising a

valid constitutional or statutory right.  For instance, in *United States v. DeMarco*,

prosecutors told defense counsel that if the defendant successfully transferred venue to

California, they would consider adding more charges against him.  550 F.2d 1224, 1226

(9th Cir. 1977).  The defendant successfully transferred venue.  *Id.*  Thereafter, the

government obtained a second indictment against the defendant containing a new

charge.  *Id.*  The court held that "it was not constitutionally permissible for the

Government to threaten to 'up the ante' to discourage [the defendant] from exercising

his venue right; *a fortiori* it was constitutionally impermissible to follow up the threat

with [additional charges]."  *Id.* at 1227–28.

Similarly, in *United States v. Hollywood Motor Car Company, Inc.*, the Ninth

Circuit held that a prosecutor and customs agent acted vindictively by threatening to

bring additional charges against the defendants if they exercised their right to request a

change of venue.  646 F.2d 384, 388 (9th Cir. 1981), *rev'd on other grounds*, 458 U.S.

15

263 (1982) (per curiam). After the defendants successfully challenged venue, and on the request of the old prosecutor, the prosecutors in the new district obtained a superseding indictment that contained additional charges. *Id.* at 385–86. The court held that the prosecutor and customs agent's threats violated due process and required dismissal of the superseding indictment. *Id.* at 388–89. Critically, the court rejected the government's view that, because the case involved "two separate prosecutors' offices," the defendants had failed to establish that the new prosecutors acted vindictively. *Id.* at 387. The Court explained that venue challenges almost always involve independent prosecuting agencies, so a contrary holding would "unreasonably restrict" the vindictiveness doctrine in that context. *Id.* at 387. The court further reemphasized the principle enunciated in *DeMarco*, explaining that dismissal was a "prophylactic" remedy designed "to prevent chilling the exercise of such rights by other defendants who must make their choices under similar circumstances in the future." *Id.* at 388 (quoting *DeMarco*, 550 F.2d at 1227).

And, just like in the judicial context, the mere appearance of prosecutorial vindictiveness can give rise to a presumption of vindictiveness, even in the absence of direct threats. For example, in *United States v. Jenkins*, the Ninth Circuit considered whether the government's prosecution against a defendant for alien smuggling gave rise to a presumption of vindictiveness. 504 F.3d 694, 697–98 (9th Cir. 2007). The court held that it did, because the government decided to bring the new charges only after the defendant had testified in her defense against charges of marijuana smuggling. *Id.* at 699. In her testimony, the defendant said she thought the vehicle in which she had been a passenger contained undocumented aliens, and not marijuana. *Id.* at 697. The court reasoned that the government created an appearance of vindictiveness because, although it already had an "open and shut" case against the defendant on alien smuggling, it chose not to bring those charges until after she testified in her defense in the marijuana case. *Id.* at 697, 700. The Ninth Circuit reached this conclusion even though the defendant had no direct evidence of any improper government motive. *Id.*

at 699; *see also United States v. Goodwin*, 457 U.S. 368, 373 (1982) ("Motives are complex and difficult to prove. As a result, in certain cases in which action detrimental to the defendant has been taken after the exercise of a legal right, the Court has found it necessary to 'presume' an improper vindictive motive."). And, once a defendant raises a presumption of vindictiveness, the burden shifts to the government to furnish "objective evidence justifying the prosecutor's action." *Jenkins*, 504 F.3d at 701 (quotation marks omitted).

Importantly, to establish vindictive prosecution, a defendant need not show that the prosecutors themselves harbored the impermissible animus; a defendant may also show the prosecutors were "prevailed upon to bring the charges by another with animus such that the prosecutor[s] could be considered a 'stalking horse,' and . . . he would not have been prosecuted except for the animus." *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999) (quotation marks omitted); *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000). The Ninth Circuit has similarly recognized that, although the biases of a law enforcement officer do not necessarily support a vindictive prosecution claim, those biases can be imputed in "extreme cases." *United States v. Gilbert*, 266 F.3d 1180, 1187 (9th Cir. 2001).[13]

And finally, because due process binds both judges and prosecutors from engaging in vindictiveness, it obviously binds law enforcement officers from doing the same, too. The Supreme Court is clear: "To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" *Goodwin*, 457 U.S. at 372 (quoting *Bordenkircher*, 434 U.S. at 363). Further, it is

---

[13] In *Gilbert*, the defendant failed to raise an appearance of vindictiveness after being indicted on tax charges. *Id.* The defendant alleged that he had successfully sued an IRS agent for making unauthorized disclosures during the investigation of his case. *Id.* at 1186 & n.6. The defendant claimed that his successful legal action against the IRS, combined with the agent's departure from IRS protocol governing criminal investigations, showed that the IRS's referral to the prosecution was vindictively motivated. *Id.* at 1186. However, besides these generalized allegations, he provided no other evidence showing that the prosecutor's decision to seek an indictment was based on his civil suit. *Id.* Thus, the court declined to hold that the defendant's allegations on the part of the IRS could be imputed to the prosecutor. *Id.* at 1187.

"patently unconstitutional" "for an *agent* of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights." *Bordenkircher*, 434 U.S at 363 (emphasis added). Due process thus not only prohibits vindictive prosecution, but also vindictive enforcement. In other words, a police officer cannot punish individuals simply because they invoked their constitutional rights.[14] That is a "basic— and itself uncontroversial—position." *See Goodwin*, 457 U.S. at 372. Any other view would undermine due process and "chill[] the exercise" of constitutional rights. *See Hollywood Motor Car*, 646 F.2d at 388; *see also United States v. Meyer*, 810 F.2d 1242, 1249 (D.C. Cir.), *reh'g en banc granted, opinion vacated,* 816 F.2d 695 (D.C. Cir. 1987), and *opinion reinstated on reconsideration sub nom. Bartlett on Behalf of Neuman v. Bowen*, 824 F.2d 1240 (D.C. Cir. 1987) (reasoning that, "[i]f in cases of vindictive prosecution the trial court judge may only dismiss the additional charge, the prosecutor will have nothing to lose by acting vindictively").

In sum, a defendant may prove vindictiveness prosecution through direct evidence, such as explicit threats. *Hollywood Motor Car*, 646 F.2d at 388; *DeMarco*, 550 F.2d at 1227. A defendant may also raise a presumption of vindictiveness upon demonstrating a "reasonable likelihood" that the government brought additional charges because the defendant exercised his constitutional or statutory rights. *Goodwin*, 457 U.S. at 373; *Jenkins*, 504 F.3d at 699. A defendant may also raise a presumption of vindictiveness by showing that a law enforcement officer engaged in "extreme" conduct, *Gilbert*, 266 F.3d at1187, or otherwise used the prosecuting agency as a "stalking horse," *Koh*, 199 F.3d at 640. And, once a presumption of vindictiveness is shown, the burden shifts to the government to show that the charges did not stem from a vindictive motive but were justified by independent reasons. *Jenkins*, 504 F.3d

---

[14] Just in the same way that the equal protection clause prohibits prosecutors from engaging in selective *prosecution*, it also bars police officers from engaging in selective *enforcement*. *See United States v. Sellers*, 906 F.3d 848, 852 (9th Cir. 2018) ("Selective prosecution and selective enforcement claims are undoubtedly related . . . .") (citing *Lacey v. Maricopa Cty.*, 693 F.3d 896, 920 (9th Cir. 2012) (en banc)). The same protections must exist in the due process context, too.

18

at 701.  Last, a due process violation occurs regardless of whether the vindictive actor is a judge, prosecutor, or law enforcement officer.  *See Bordenkircher*, 434 U.S at 363.

### 2.    The government violated Ms. Ford's due process rights.

With these principles in mind, this Court should find a due process violation here.  Ms. Ford can easily prove Detective Vinton was actually vindictive against her in his enforcement of the law.  Further, it is clear that the government shared the same retaliatory motive Detective Vinton had.  Detective Vinton's vindictiveness can also, under these extreme circumstances, be directly imputed to the FBI and USAO.  And, at a minimum, Ms. Ford raises a strong presumption that the USAO was acting as a "stalking horse" to carry out Detective Vinton's retaliatory threats.

The evidence that Detective Vinton acted vindictively is overwhelming.  He made explicit, unambiguous threats directly in response to Ms. Ford's invocation of her Fifth Amendment rights.  Ms. Ford's account of these persistent threats is detailed, consistent, and credible.  After Detective Vinton informed Ms. Ford that she was being charged with murder, she told him she did not want to speak with him and demanded to have a lawyer present.  (Ford Decl. ¶¶ 9–11.)  Detective Vinton was legally required to immediately cease questioning.  *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).  Instead, he asked her why she was asking for a lawyer and persisted questioning Ms. Ford, even as she cried, shook her head, and repeatedly asked for a lawyer.  (Ford Decl. ¶¶ 13–14.)  And, after a short break in questioning, he brought her back for a second round of interrogation.  (*Id.* ¶ 15.)  Ms. Ford continued telling Detective Vinton that she did not want to speak with him and wanted to have an attorney present, but he was relentless.  (*Id.*)

After Ms. Ford repeatedly invoked her rights, Detective Vinton decided to "up the ante."  (*Id.* ¶¶ 20–22); *see DeMarco*, 550 F.2d at 1227–28.  He threatened Ms. Ford that if she insisted on remaining silent, he would contact SA Corcoran to charge Ms. Ford federally and thus cause her to face much more prison time.  (Ford Decl. ¶¶ 21–23.)  He showed Ms. Ford his correspondence with SA Corcoran.  (*Id.* ¶ 23.)

19

And he emphasized that if Ms. Ford would simply answer his questions, he would not refer her case to the FBI.  (*Id.*)  When federal agents finally arrested Ms. Ford, Detective Vinton was present.  (*Id.* ¶ 36.)  He told her, "You see?  I told you this was going to happen."  (*Id.* ¶ 37.)  He also told her, "You have one more chance to tell us who did it."  (*Id.* ¶ 36.)

These threats were vindictive.  They closely resemble the explicit threats the Ninth Circuit deemed impermissible in *Hollywood Motor Car* and *DeMarco*.  But his threats were even worse than those.  Unlike the prosecution's interference with the right to pursue a change in venue, Detective Vinton interfered with Ms. Ford's Fifth Amendment rights.  Those rights are core to our criminal justice system and have long been recognized as the only guarantee against the "inquisitorial and manifestly unjust methods" used in foreign jurisdictions.  *See Miranda v. Arizona*, 384 U.S. 436, 442 (1966) (quotation marks omitted).  Detective Vinton's retaliation in response to Ms. Ford's invocation of these rights is vindictive.  This Court should dismiss on this basis alone.

The evidence also strongly suggests that the government shared in Detective Vinton's retaliatory motive for at least four reasons.  First, SA Corcoran immediately began investigating Ms. Ford soon after Detective Vinton's referral.  (Ex. 1, at Bates 177–240.)  This is consistent with Ms. Ford's testimony that she saw Detective Vinton texting a "Sarah" to refer her case for federal prosecution.  (Ford Decl. ¶ 23.)

Second, SA Corcoran sought and obtained arrest and search warrants against Ms. Ford only seven days after Detective Vinton asked for—and Ms. Ford ignored—his request for information relating to his homicide investigation.  (*See* Exs. 2–4.)  The search warrant was extremely broad and would have enabled the government to obtain access to Ms. Ford's social media accounts—the same information that Detective Vinton wanted to access.  (*See* Ex. 4, at Bates 316–17.)  It is inconceivable that the government needed this information to prove the instant charges.  And, *on the same day* SA Corcoran obtained the warrant—that is, four months after her initial arrest for the

homicide—Detective Vinton asked Ms. Ford again for information about the homicide. (Ex. 3.)  The timing strongly suggests that Detective Vinton and SA Corcoran were actively communicating about his homicide investigation, and SA Corcoran was using the federal process to assist him in collecting further information.

Third, when SA Corcoran arrested Ms. Ford, Detective Vinton was present, which is puzzling and inappropriate by all appearances.  (Ford Decl. ¶ 35.)  Instead of asking Ms. Ford about the gun charges, SA Corcoran and Detective Vinton focused on the alleged homicide and interrogated her about it.  (*Id.* ¶ 36.)  SA Corcoran chose not to record that interrogation, which represents a radical departure from normal federal post-arrest protocol in this district.

Fourth, soon after Ms. Ford made her initial appearance, the government contacted defense counsel and twice requested the passcode to access Ms. Ford's phone.  (Counsel Decl. ¶¶ 5–7.)  After defense counsel refused, the government asked if Ms. Ford wanted to provide information to assist Detective Vinton's homicide investigation, despite conceding that the homicide had no federal nexus.  (*Id.* ¶¶ 8–10.)  This sequence of events heavily suggests that SA Corcoran told the government that she wanted to assist Detective Vinton's homicide investigation.

SA Corcoran's actions show that she knew exactly why Detective Vinton referred her case for federal prosecution, and she sought a criminal complaint motivated by that purpose.  She further told the government about Detective Vinton's desires to obtain information from Ms. Ford about the alleged homicide.  The government thus adopted Detective Vinton's motives.  And, even if the government now claims that it did not know the referral followed an explicit threat in response to Ms. Ford's invocation of her Fifth Amendment rights, Detective Vinton successfully turned the government into a "stalking horse" to follow through on his threats.  *See Koh*, 199 F.3d at 640.  At a minimum, the sequence of events raises a strong presumption of vindictiveness.  *See Jenkins*, 504 F.3d at 699.

21

1    Finally, this case presents "extreme" circumstances.  *See Gilbert*, 266 F.3d at

2    1187.  For one, Detective Vinton's threats were egregious and continued over the

3    course of four months.  The threats violated Ms. Ford's Fifth Amendment rights.  Well

4    after making the threats, Detective Vinton actively harassed, intimidated, and interfered

5    with Ms. Ford's life.  (Ford Decl. ¶ 29; Fenster Decl. ¶¶ 3–6.)  The entire federal

6    investigation into Ms. Ford was prompted by Detective Vinton's vindictive referral.

7    And, as the federal prosecution was underway, the government continued to attempt to

8    extract information from Ms. Ford about the alleged homicide.  Detective Vinton thus

9    used the federal prosecution to punish Ms. Ford, circumvent her constitutional rights,

10   and access the information on her phone.  He used her federal arrest to question her

11   further.  The government either actively assisted Detective Vinton or tacitly approved

12   of his conduct.  His vindictiveness can thus be imputed to the USAO.  *See id.*

13   **B.**   **The government's conduct was outrageous.**

14   This Court can also dismiss the indictment because the government's conduct

15   here is outrageous.  Outrageous government conduct occurs when the actions of law

16   enforcement are "so outrageous that due process principles would absolutely bar the

17   government from invoking judicial processes to obtain a conviction."  *United States v.*

18   *Russell*, 411 U.S. 423, 431–32 (1973).  A defendant is entitled to relief upon

19   demonstrating that the government's conduct "violates fundamental fairness" and is "so

20   grossly shocking and so outrageous as to violate the universal sense of justice."  *United*

21   *States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (*quoting United States v. Stinson*,

22   647 F.3d 1196, 1209 (9th Cir. 2011)).  "There is no bright line dictating when law

23   enforcement conduct crosses the line between acceptable and outrageous, so every case

24   must be resolved on its own particular facts."  *Id.* (quotation marks omitted).

25   The doctrine was born in *Rochin v. California*, 342 U.S. 165 (1952), where law

26   enforcement forcibly pumped the stomach of defendant, obtained contraband, and

27   thereafter charged him for its possession.  *Id.*  The Supreme Court found that these

28   tactics were so fundamentally unfair and shocking as to violate due process.  *Id.* at 174.

1   Federal appellate courts have extended this doctrine to cover non-physical conduct as

2   well.  For instance, two circuit courts have found outrageousness when law

3   enforcement, pursuing sting operations, becomes so fundamentally intertwined with the

4   creation of the crime that it was barred from prosecution.  *See United States v. Twigg*,

5   588 F.2d 373 (3d Cir.1978); *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971).

6          For all the same reasons outlined above, the conduct here was outrageous.

7   Detective Vinton engaged in flagrant violations of Ms. Ford's Fifth Amendment rights.

8   When she remained steadfast in invoking those rights, he explicitly threatened her with

9   federal prosecution and then leveraged his connections in the federal government to

10  punish her.  He hoped that the pressure would succeed in forcing her to waive those

11  rights.  His threat left her with the bleak choice of exercising those rights or

12  succumbing to a federal prosecution.  Such conduct is brazen, outrageous, and

13  shocking.  It dilutes longstanding protections against "sustained and protracted

14  questioning incommunicado in order to extort confessions," *Miranda*, 384 U.S. at 446;

15  it corrupts the federal administration of justice; and it undermines the confidence in law

16  enforcement and the criminal justice system as a whole.

17         Detective Vinton's conduct didn't end there, however.  After she was released,

18  he pursued Ms. Ford relentlessly, (*see* Exs. 2–3; Fenster Decl. ¶¶ 3–6), and—for

19  inexplicable reasons—was present with the federal arrest team so that he could

20  interrogate her once again, (Ford Decl. ¶¶ 35–37).  SA Corcoran's actions along the

21  way compound the outrageousness.  She invoked judicial processes to gain broad

22  access to her phone and obtain the same information Detective Vinton was seeking.

23  (Ex. 4.)  SA Corcoran brought Detective Vinton to interrogate Ms. Ford, even though

24  she knew his investigation had nothing to do with her firearm investigation.  (Ford

25  Decl. ¶ 24.)  SA Corcoran questioned Ms. Ford about the homicide, too, even though

26  she knew it had no federal nexus.  (*Id.*)  Together, this conduct is "so grossly shocking

27  and so outrageous as to violate the universal sense of justice."  *Black*, 733 F.3d at 302.

28

23

The egregiousness of Detective Vinton's conduct is further aggravated by his long career of destroying people's lives. Twenty years ago, local prosecutors spoke *publicly*—a feat in itself—about Detective Vinton's "extremely reckless" conduct, lack of credibility, and rogue law enforcement philosophy. It is rare for prosecutors to speak publicly against their own agents' bad deeds, and they would not have done so unless their concerns were so deeply engrained and unshakeable that they felt the entire administration of justice was at stake. Instead of suffering real consequences for his conduct, Detective Vinton is now leveraging his connections in federal law enforcement to bully people into waiving their constitutional rights. And, instead of distancing itself from this officer, the government has turned into his stalking horse. By continuing to pursue this prosecution, the government is ratifying the bad conduct of this bad officer. This conduct is "grossly shocking" and "violate[s] the universal sense of justice." *Black*, 733 F.3d at 302. It is outrageous. This Court should dismiss the indictment on this ground.

## C.    The government selectively enforced the law.

Equal protection prohibits law enforcement officers from selectively enforcing the law. *Lacey*, 693 F.3d at 920. Arbitrary enforcement based on a defendant's race, religion, or decision to exercise protected legal rights is prohibited. *Wayte v. United States*, 470 U.S. 598, 608 (1985). To establish a claim of selective enforcement, a defendant must show both discriminatory effect and discriminatory purpose. *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *Sellers*, 906 F.3d at 852.

### 1.    Discriminatory purpose

To satisfy the "discriminatory purpose" element, a defendant must show that the decision to enforce the law against him was made "on the basis of an impermissible ground such as race, religion or exercise of . . . constitutional rights." *Lacey*, 693 F.3d at 922 (quotation marks omitted); *see also id.* at 920 ("Enforcement may be shown through a variety of actual or threatened arrests, searches and temporary seizures, citations, and other coercive conduct by the police.").

24

Ms. Ford has provided direct evidence of Detective Vinton's discriminatory purpose.  Detective Vinton's explicit threats, by their own terms, satisfy this element.  In the face of Ms. Ford's invocation of her Fifth Amendment rights, Detective Vinton threatened that if she did not answer his questions, he would refer her case for federal prosecution, where she faced significantly higher penalties for the previously charged conduct.  This threat was issued either to abrogate Ms. Ford's rights, or punish her for her decision to exercise them.  Either way, the referral and the resulting federal prosecution are direct and explicit forms of retaliation based on her exercise of her constitutional rights.  Detective Vinton had a discriminatory purpose.

### 2.    Discriminatory effect

To prove a "discriminatory effect," a defendant "must show that similarly situated individuals . . . were not prosecuted."  *Id.* at 920 (quotation marks omitted).

The nature of Detective Vinton's threat, and his subsequent actions, show that Ms. Ford suffered a discriminatory effect.  Detective Vinton made her choices clear:  if she simply answered his questions and waived her rights, he would not refer her case to the FBI, but if she remained steadfast, he would.  That plainly shows that a similarly situated person who waived their rights would not have been referred for federal prosecution.  And, after Detective Vinton followed through on his express threat, and Ms. Ford was arrested, Detective Vinton told her, "You see?  I told you this was going to happen."  (Ford Decl. ¶ 37.)  That sufficiently shows that Ms. Ford suffered in a way that a similarly situated person would not have suffered.

Because Detective Vinton selectively enforced the law against Ms. Ford, he violated her equal protection rights.  This Court should dismiss the Indictment.

### D.    This Court should compel discovery in support of Ms. Ford's claims.

For the above reasons, Ms. Ford has proven that she suffered from vindictive enforcement, vindictive prosecution, outrageous government conduct, and selective enforcement.  At a minimum, this Court should order the government to produce discovery relating to these claims.

1       "In limited circumstances, individuals have the right to pursue discovery against

2   the government to support claims of vindictive prosecution." *United States v. One*

3   *1985 Mercedes*, 917 F.2d 415, 421 (9th Cir. 1990). "Thus, a criminal defendant may

4   be entitled to discovery if he or she establishes a prima facie showing of a likelihood of

5   vindictiveness by some evidence tending to show the essential elements of the

6   defense." *Id.*; *see also Adamson v. Ricketts*, 865 F.2d 1011, 1017–20 (9th Cir. 1988)

7   (remanding for evidentiary hearing because the plaintiff "ha[d] made an initial showing

8   to raise a presumption of vindictiveness that the State has not thus far rebutted").

9       Further, to obtain discovery pertaining to a selective prosecution claim, a

10   defendant need provide only "some evidence tending to show the existence of the

11   essential elements of the defense, discriminatory effect and discriminatory intent."

12   *Armstrong*, 517 U.S. at 468 (quotation marks omitted). But with regard to a selective

13   enforcement claim, the threshold is even lower: a defendant need only show

14   "something more than mere speculation to be entitled to discovery . . . ." *Sellers*, 906

15   F.3d at 855. As the Ninth Circuit explained, two rationales justify the relaxed standard

16   to pursue discovery for a selective enforcement claim. *Id.* at 853. First, law

17   enforcement agents do not enjoy the same strong presumption that they are

18   constitutionally enforcing the law that prosecutors do. *Id.* Second, evidence of

19   similarly situated persons is often unavailable to a defendant in the enforcement

20   context. *Id.* For example, "[a]sking a defendant claiming selective enforcement to

21   prove who could have been targeted by an informant, but was not, or who the ATF

22   could have investigated, but did not, is asking him to prove a negative; there is simply

23   no statistical record for a defendant to point to." *Id.*

24       As described above, Ms. Ford easily clears the hurdle to obtain discovery on all

25   of her claims. Therefore, if this Court is not prepared to dismiss the Indictment,

26   Ms. Ford respectfully asks this Court to compel the government to produce discovery to

27   further develop her claims. Further, just like the defendants in *Sellers*, Ms. Ford cannot

28   identify specific, similarly situated persons who have been treated differently had they

waived the rights she chose to exercise. Statistics and records pertaining to how the LAPD refers local firearms charges to the government are not public record. *See id.* The LAPD does not publish information pertaining to the interrogation of suspects in murder investigations, still less regarding those who invoke their Fifth Amendment rights in the course of interrogation. Defense counsel has sought, through discovery, information that would permit them to identify such "similarly situated" individuals. However, the government has refused to comply with those requests. In light of this, requiring Ms. Ford to make such a showing here would, impossibly, require her to prove a negative. *See id.* There is simply no statistical record for her to point to. *See id.*

Thus, Ms. Ford respectfully asks this Court to compel discovery. A complete list of the discovery requested is filed herewith as Appendix A.

## IV. CONCLUSION

For the reasons stated above, Ms. Ford respectfully asks this Court to dismiss the Indictment against her. In the alternative, Ms. Ford asks for a finding of a presumption of vindictiveness, an evidentiary hearing, and further respectfully requests that this Court compel the government to produce the requested discovery.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: August 15, 2022          */s/ Antonio Villaamil*
_____
ANTONIO VILLAAMIL
WASEEM SALAHI
Deputy Federal Public Defenders

27