# EXHIBIT 5

**FEDERAL PUBLIC DEFENDER**
CENTRAL DISTRICT OF CALIFORNIA
321 EAST 2nd STREET
LOS ANGELES, CALIFORNIA 90012-4202
213-894-2854
213-894-0081 FAX

**CUAUHTEMOC ORTEGA**
*Federal Public Defender*
**AMY M. KARLIN**
*Chief Deputy*

**ANGELA VIRAMONTES**
*Riverside Branch Chief*
**KELLEY MUNOZ**
*Santa Ana Branch Chief*
**K. ELIZABETH DAHLSTROM**
*Chief, Capital Habeas Unit*

Direct Dial: (213) 894-2922

August 5, 2022

Alexander Su
United States Attorney's Office
312 N. Spring Street
Los Angeles, CA 90012
*Via Email*

      Re:    <u>Request for Dismissal</u>
                *United States v. Brieshanay Quenise Ford*, 2:22-cr-00200-PA

Dear Counsel:

      We write to share serious concerns we have about this case and inform you in advance of our intention to file motions to dismiss based on, among other claims, vindictive and selective prosecution and enforcement. We also reiterate our demand for discovery in support of those claims. Ms. Ford's claims arise based on what we have uncovered since we first began investigating this case:

**Factual Background**

      1.    On November 23, 2021, local authorities arrested Ms. Ford for unlawfully possessing a firearm. Federal charges were not brought until April 21, 2022.

      2.    As her state charges were pending, on December 14, 2021, officers from the Los Angeles Police Department (LAPD) raided Ms. Ford's home and arrested her on a murder charge. She was transported to the precinct and interrogated by LAPD Detective Dave Vinton.

      3.    Ms. Ford invoked her right to remain silent, asked for a lawyer, and told Detective Vinton that she didn't want to talk. Instead of ending questioning as he was legally required to do, Detective Vinton persisted. Eventually, while processing Ms. Ford at the jail, he threatened her. Detective Vinton told her that he knew she had a pending state charge for possessing a firearm, and that, if she didn't talk, and if she insisted on asking for a lawyer, he had a friend at the FBI whom he could contact to have her pending gun charges upgraded to a federal

August 5, 2022
Page 2

prosecution. He told her she would be facing much more time on the charges if that happened. Ms. Ford nonetheless invoked her right to remain silent and asked for a lawyer. We believe the "FBI friend" he was referring to is FBI Special Agent Sarah Corcoran, the case agent assigned here. Again, instead of ceasing questioning, Detective Vinton showed his phone to Ms. Ford, and, as he did so, texted "Sarah," meaning SA Corcoran, in real time, asking her to look into Ms. Ford and explore the possibility of filing federal criminal charges against her. Detective Vinton emphasized that if Ms. Ford would simply talk to him, he would call off the federal prosecution. Still, Ms. Ford refused to answer, as was her right, and asked for a lawyer.

    4.    Ms. Ford remained in jail for the next two days. During that time, she never saw a judge; she never saw an attorney. Before her initial appearance, the local district attorney declined to file homicide charges, and she was finally released on December 16. We believe her arrest was without probable cause and served as a pretextual way to get her into an interrogation room.[1] Though she was released, Detective Vinton maintained custody of her phone for several months. (As explained below, SA Corcoran sought permission to seize and search this phone.)

    5.    In early January 2022, right after the holidays—and consistent with Detective Vinton's threats in response to Ms. Ford invoking her Fifth and Sixth Amendment rights—SA Corcoran began pulling records on Ms. Ford and building a federal criminal prosecution against her. SA Corcoran ran various CLETS searches on Ms. Ford and verified that she qualified for federal prosecution.

    6.    Over the next few weeks, Detective Vinton continued to harass Ms. Ford and her live-in partner. On the evening of March 23, 2022, for instance, Detective Vinton texted Ms. Ford stating, "Can you try and find that dudes Instagram account." Ms. Ford did not respond.

    7.    On March 30, 2022, SA Corcoran sought and received an arrest and search warrant. SA Corcoran drafted the scope of the warrant extremely broadly, seeking permission not only to search a digital device—which hardly would have contained evidence of her firearm possession from *five* months prior—but also "any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, folders, and bags." This warrant, we believe, was a pretextual means for SA Corcoran to gain access to Ms. Ford's phone to benefit Detective Vinton's homicide investigation. It is clear from text message correspondence that Detective Vinton wanted to access Ms. Ford's phone and believed that the federal search warrant, which authorized SA Corcoran to bypass the device's password by using Ms. Ford's biometric data, would enable him to access evidence of the alleged homicide and, specifically, her social media accounts and messages.

    8.    That same day, Detective Vinton made a last-ditch effort to extract information from Ms. Ford, despite her clear invocation of her Fifth and Sixth Amendment rights. He texted

---

[1] This is consistent with your understanding as well; over several phone calls, you confirmed with us that Ms. Ford is not deemed an actual suspect in this homicide investigation.

August 5, 2022
Page 3

her, urging her once again to "try and find that dudes Instagram account," falsely promising, "I want to clear your name." As before, Ms. Ford continued to ignore him.

9. On April 21, 2022, after Ms. Ford appeared in state court on the local gun case, SA Corcoran arrested Ms. Ford. Alarmingly, she was accompanied by Detective Vinton, whose presence was puzzling and inappropriate by all appearances. Together, SA Corcoran and Detective Vinton tried to interrogate Ms. Ford—not about the federal charges, but instead the homicide. As before, Ms. Ford did not respond, consistent with her wishes to remain silent. SA Corcoran seized Ms. Ford's phone, and, shortly thereafter, AUSA Lynda Lao asked undersigned counsel if we would provide her with the password to access Ms. Ford's phone. We declined.

10. Soon thereafter, you asked us whether Ms. Ford would be interested in cooperating in a homicide investigation, even though, according to your understanding, that case involved no federal nexus.

**Detective Vinton's History of Misconduct**

11. Detective Vinton's actions here, while extremely disturbing (and unconstitutional), are fully consistent with his long, documented history of violating the due process rights of those who come within his midst. His wrongdoing has been detailed at length in law review articles[2] and news stories.[3] He was famously involved in the Rampart scandal and has a documented history of falsifying and planting evidence.[4] And, as our motion will make clear, Detective Vinton has also been the subject of dozens of civil lawsuits for violating people's civil and constitutional rights.

12. As evidence of Detective Vinton's misconduct came to light, even local prosecutors called his credibility into doubt. According to an article published in the *Los Angeles Times*, one prosecutor called Detective Vinton's actions "extremely reckless," and stated that, during an internal investigation, his attitude "was so bad that quite frankly it was as if he were lying."[5]

13. During that same internal investigation, Detective Vinton provided a particularly illuminating insight into his law enforcement philosophy. He lamented to one district attorney

---

[2] *See, e.g.*, Gary C. Williams, *Incubating Monsters?: Prosecutorial Responsibility for the Rampart Scandal,* 34 Loy. L.A. L. Rev. 829, 831 (2001).

[3] Matt Lait and Scott Glover, *DNA Evidence in 4 Drug Cases Refutes Officers*, L.A. TIMES (April 26, 2000, 12:00 AM), https://www.latimes.com/archives/la-xpm-2000-apr-26-mn-23499-story.html.

[4] *Id.*

[5] *Incubating Monsters*, *supra*, at 831 (internal citations omitted).

August 5, 2022
Page 4

that "she and the LAPD were doing things the old way and didn't understand the way things had to be done to catch these gangbangers."[6]

14.  Detective Vinton's philosophy to do things the way that he believed they "had to be done"—even if those ways were unethical and unconstitutional—apparently extends to the present and have irreparably tainted your office's prosecution against Ms. Ford.

**Next Steps**

These facts compel a dismissal of this case, and we believe this effort should begin with you, not us.  We are, quite frankly, surprised that someone with this kind of history has any kind of relationship with or sway over a federal agent or the USAO.  We are surprised that SA Corcoran maintained contact with him, and—from all appearances—seems to have colluded with him to punish Ms. Ford for exercising her Fifth and Sixth Amendment rights.

Further, we are surprised that in one of our first conversations discussing how to resolve this case, you asked us if Ms. Ford would be willing to cooperate in this same homicide investigation.  Whether your office intentionally and actively worked with Detective Vinton to punish Ms. Ford—or whether your office was unwittingly manipulated into doing so—the only appropriate outcome is dismissal.

Due process protects all people from vindictive prosecution and, specifically, the filing of criminal charges to penalize the valid exercise of constitutional rights.[7]  Likewise, selective prosecutions and enforcement actions motivated by a defendant's choice to exercise protected legal rights violate equal protection.[8]

The above facts form the basis of a very strong motion to dismiss for vindictive and selective prosecution and enforcement; it also supports our basis to pursue additional discovery to corroborate our claims, detailed below.  We want to be clear that we are seeking dismissal now not because we are averse to filing the motions, but because we believe it is the right

---

[6] *DNA Evidence in 4 Drug Cases Refutes Officer*, supra.

[7] *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort."); *see also Blackledge v. Perry*, 417 U.S. 21, 28–29 (1974) (due process violated when defendant prosecuted for more serious charge in new trial after successful appeal of conviction); *United States v. Rosales-Aguilar*, 818 F.3d 965, 971 (9th Cir. 2016) (due process violated if prosecutor seeks to punish defendant for exercising protected legal rights).

[8] *Wayte v. United States*, 470 U.S. 598, 608 (1985) ("The decision to prosecute may not be deliberately based upon an unjustifiable standard such as . . . the exercise of protected statutory and constitutional rights.") (internal citations omitted); *see also United States v. Steele*, 461 F.2d 1148, 1151–52 (9th Cir. 1972) (defendant selectively prosecuted for exercising First Amendment rights).

August 5, 2022
Page 5

outcome for all parties.  Ms. Ford is suffering under federal prosecution because a police officer with an egregious history of misconduct has leveraged his connections with your office to punish Ms. Ford for exercising her Fifth and Sixth Amendment rights, and is now trying to strongarm her—through the federal process—into waiving those rights.

We want to be transparent with you now that, absent a dismissal, we will exhaustively litigate these issues on behalf of our client.  We believe that the circumstances are extraordinary here and that this justifies sending this case back to the state.  If you choose, however, to continue prosecuting her federally, we will allege in our motion that your office is ratifying the bad conduct of this bad officer.

**Renewed Discovery Demand**

If the government declines to dismiss charges in this case, we reiterate our formal demand for discovery, originally dated June 23, 2022, relating to the facts we've detailed above.  Because of the imminent motions deadline, currently set for August 15, 2022, we request discovery to be produced no later than August 10, 2022, for the following items:

- Police reports, and all written documents, pertaining to the homicide in question;

- All written or verbal communications between any law enforcement officer and federal agent or prosecutor regarding this alleged homicide and Ms. Ford's alleged involvement;

- All text messages, call logs, emails, voicemails, and all other written or verbal communications between FBI Special Agent Sarah Corcoran (or any other federal law enforcement officer) and LAPD Detective Dave Vinton (or any other state law enforcement officer), regarding Ms. Ford and the decision to refer her for federal criminal prosecution, or confirm that no such communications exist;

- Copies of all communications between any federal prosecutor and any federal or state law enforcement officer regarding Ms. Ford, including communications related to the LAPD's homicide investigation, or confirm that no such communications exist;

- Audio recordings of Ms. Ford's interrogations after her Dec. 14 arrest;

- Audio recordings between Ms. Ford and any jailhouse informants that the LAPD placed in Ms. Ford's cell;

- A copy of the affidavit supporting probable cause for Ms. Ford's Dec. 14 arrest and the search of her residence and/or personal property;

- Copies of all transportation logs showing where Ms. Ford was placed between Dec. 14 and Dec. 16;

August 5, 2022
Page 6

- Copies of surveillance footage depicting Ms. Ford providing buccal swabs after the Dec. 14 arrest;

- Copies of all communications between Detective Vinton (or any other law enforcement officer) and any local district attorney who was involved in Ms. Ford's Dec. 14 arrest;

- Police reports implicating Ms. Ford in the alleged homicide;

- Body camera footage of all interactions with Ms. Ford during and after her Dec. 14 arrest.

- Please instruct whether Detective Vinton (or any other law enforcement officer) was present with Special Agent Corcoran (or any other federal agent) during Ms. Ford's federal arrest on the instant criminal case;

- Any records from Ms. Ford's arrest on the federal charge, *e.g.*, audio recordings or body camera footage, if they exist; and

- Documentation regarding all USAO and federal law enforcement policies on accepting referrals from local law enforcement agencies for federal prosecution.

We hope that you will consider this letter in the spirit that it is intended. We are, as always, happy to confer with you further should you have any questions.

Sincerely,

Antonio Villaamil
Waseem Salahi
Deputy Federal Public Defenders