CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
WASEEM SALAHI (Bar No. 325362)
ANTONIO VILLAAMIL (Bar No. 5205315)[1]
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
    waseem_salahi@fd.org
    antonio_villaamil@fd.org
    (213) 894-4748
    (213) 894-0081 FAX

Attorneys for Defendant
BRIESHANAY FORD

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES,<br><br>                    Plaintiff,<br><br>          v.<br><br>BRIESHANAY FORD,<br><br>                    Defendant. | NO. 2:22-CR-200-PA<br><br>**DEFENDANT'S REDACTED REPLY IN SUPPORT OF MOTION TO DISMISS FOR VINDICTIVE PROSECUTION, VINDICTIVE ENFORCEMENT, SELECTIVE ENFORCEMENT; MOTION TO COMPEL DISCOVERY; SUPPLEMENTAL DECLARATIONS**<br><br>DATE:     Sept. 6, 2022<br>TIME:     3:00 p.m. |

Defendant Brieshanay Ford, through counsel, files this redacted reply (*see* Dkt. No. 52), in support of her motion to dismiss for vindictive prosecution, vindictive enforcement, outrageous government conduct, and selective enforcement, or, in the alternative, her motion to compel discovery. Ms. Ford also seeks dismissal under this Court's inherent authority. Further, because defense counsel anticipates receiving additional materials pursuant to subpoenas served on the Los Angeles Police

_____

[1] As a government attorney and a member of the New York State Bar, Antonio Villaamil has been admitted to practice before the United States District Court for the Central District of California.

1

Department, Ms. Ford respectfully requests an opportunity to supplement her claims with information gleaned from those materials.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  September 8, 2022     /s/ Antonio Villaamil

ANTONIO VILLAAMIL
WASEEM SALAHI
Deputy Federal Public Defenders

2

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................ 1

II.  NEW FACTUAL DEVELOPMENTS .................................................... 3

    A.    The government produces new discovery that corroborates Ms. Ford's claims. ........................................................................ 3

        1.    Ms. Ford invokes her Fifth Amendment rights seven times. ........... 3

        2.    Detective Vinton asks SA Corcoran to file federal gun charges "if need be," and SA Corcoran says, "I will 100 percent." .............. 5

        3.    SA Corcoran arrests Ms. Ford so that she and Detective Vinton can interrogate her about the alleged homicide and pressure her to submit to a "proffer." .................................................... 7

        4.    SA Corcoran hoped that a federal arrest would provide an opportunity to detain Ms. Ford. ......................................... 10

    B.    The government refuses to provide any context for the new disclosures. ........................................................................ 10

    C.    Defense counsel obtained complaints regarding Detective Vinton's history of misconduct. ........................................... 12

        1.    *Tenorio*:  Retaliation and release in exchange for information ....... 12

        2.    *Humphrey*:  Planting evidence after plaintiff declines to provide information ................................................................ 13

        3.    *Godinez*:  Excessive force and planting evidence after plaintiff declines to provide information. ..................................... 13

        4.    *Herrera*:  Excessive force following refusal to provide information ................................................................ 14

        5.    Other lawsuits:  More dishonesty and conduct unbecoming of a law enforcement officer. ................................................ 14

III.  ARGUMENT ............................................................................... 15

    A.    SA Corcoran's purported lack of knowledge about Detective Vinton's threats and motives is not credible. ......................... 15

        1.    SA Corcoran directly witnessed Detective Vinton make threats. ... 16

        2.    SA Corcoran knew that Ms. Ford did not want to talk to Detective Vinton. ................................................................ 17

        3.    SA Corcoran tried to conceal Detective Vinton's involvement because she knew she was doing something wrong. ....................... 18

i

4.    SA Corcoran was involved from day one..........................................19

5.    SA Corcoran herself wanted to interrogate Ms. Ford about the murder—and thought the federal arrest would help crack her........20

6.    SA Corcoran and Detective Vinton spoke extensively and continuously with one another.....................................................21

7.    SA Corcoran's purported "understanding" makes no sense...........21

B.    This Court should impute SA Corcoran's and Detective Vinton's vindictive intent to the USAO.....................................................22

C.    This Court can find a presumption of vindictiveness. ...............................26

D.    This Court should dismiss under its inherent authority. ...........................26

E.    The Court should grant Ms. Ford's motion to compel. ...........................27

IV.   CONCLUSION ...................................................................................29

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bartlett on Behalf of Neuman v. Bowen*,
  824 F.2d 1240 (D.C. Cir. 1987) ................................................................. 23

*Carrington v. City of L.A.*,
  2:01-cv-07432-GAF-AJWX (C.D. Cal. 2001) ......................................... 15

*Commonwealth of N. Mariana Islands v. Bowie*,
  243 F.3d 1109 (9th Cir. 2001) ................................................................. 29

*Corrales v. City of L.A.*,
  2:03-cv-00910-GAF-AJWX (C.D. Cal. 2003) ......................................... 14

*Giles v. Maryland*,
  386 U.S. 66 (1967) ..................................................................................... 29

*Godinez v. City of L.A.*,
  2:00-cv-08962-GAF-AJWX (Aug. 23, 2000) ......................................... 13

*Heck v. Humphrey*,
  512 U.S. 477 (1994) ............................................................................ 13, 14

*Herrera v. City of L.A*,
  2:00-cv-12531-GAF-AJWX (C.D. Cal. 2000) ......................................... 14

*Humphrey v. City of L.A.*,
  2:03-cv-02623-DDP-FMO, Docket 39 ....................................................... 13

*Moore v. City of L.A.*,
  2:02-cv-05355-GAF-AJWX (C.D. Cal. 2002) ......................................... 14

*Napue v. Illinois*,
  360 U.S. 264 (1959) ................................................................................... 29

*Padilla v. City of L.A.*,
  2:02-cv-05631-PA-EX (C.D. Cal. 2002) ................................................... 14

*Rodriguez v. City of L.A.*,
  2:00-cv-09218-GAF-AJWX (C.D. Cal. 2000) ......................................... 15

*Shih Wei Su v. Filion*,
  335 F.3d 119 (2d Cir. 2003) ...................................................................... 29

*United States v. Aguilar*,
  831 F. Supp. 2d 1180 (C.D. Cal. 2011) ................................................ 27

*United States v. Bernal–Obeso*,
  989 F.2d 331 (9th Cir. 1993) .................................................................. 28

*United States v. Burt*,
  619 F.2d 831 (9th Cir. 1980) .................................................................. 23

*United States v. Chapman*,
  574 F.3d 1078 (9th Cir. 2008) ............................................................... 26

*United States v. DeMarco*,
  550 F.2d 1224 (9th Cir. 1977) ............................................................... 23

*United States v. Dohm*,
  62 F.3d 1426 (9th Cir. 1995) .................................................................. 23

*United States v. Hollywood Motor Car Co., Inc.*,
  646 F.2d 384 (9th Cir. 1981) ........................................................... 23, 24

*United States v. Hooton*,
  662 F.2d 628 (9th Cir. 1981) .................................................................. 24

*United States v. Jenkins*,
  504 F.3d 694 (9th Cir. 2007) .................................................................. 23

*United States v. John*,
  2012 WL 1842789 (D. Ariz. May 21, 2012) ....................................... 23

*United States v. Kahre*,
  2009 WL 10715474 (D. Nev. Apr. 21, 2009) ..................................... 23

*United States v. Kent*,
  649 F.3d 906 (9th Cir. 2011) .................................................................. 26

*United States v. King*,
  687 F.3d 1189 (9th Cir. 2012) ............................................................... 24

*United States v Kojayan*,
  8 F.3d 1315 (9th Cir.1993) ..................................................................... 27

*United States v. Lopez*,
    474 F.3d 1208 (9th Cir. 2007) ....................................................... 24, 25, 26

*United States v. Love*,
    2011 WL 1326013 (S.D. Cal. Apr. 6, 2011) ........................................... 23

*United States v. Meyer*,
    810 F.2d 1242 (D.C. Cir. 1987)........................................................... 24

*United States v. One 1985 Mercedes*,
    917 F.2d 415 (9th Cir. 1990) ............................................................ 28

*United States v. Robison*,
    644 F.2d 1270 (9th Cir. 1981) .......................................................... 23

*United States v. Sellers*,
    906 F.3d 848 (9th Cir. 2018) ............................................................ 28

*United States v. Simpson*,
    927 F.2d 1088 (9th Cir. 1991) ...................................................... 27, 28

*United States v. Toomer*,
    2018 WL 3745815 (D. Nev. Aug. 6, 2018)............................................ 23

*United States v. W.R. Grace*,
    526 F.3d 499 (9th Cir. 1991) ............................................................ 27

*Tenorio v. City of L.A.*,
    2:00-cv-06177-GAF-AJWX (C.D. Cal. 2000) ........................................ 12

**Constitutional Authorities**

US. Const. amend. V ...................................................................*passim*

# POINTS & AUTHORITIES

## I.   INTRODUCTION

So far, everything Ms. Ford has alleged has been found to be true or remains undisputed.  Since Ms. Ford filed her moving papers and provided a detailed account of LAPD Detective David Vinton's misconduct, the government has produced discovery, including forty pages of text messages and an audio recording of her December 14, 2021 interrogation, that not only corroborates her factual account, but also strengthens her legal claims.  The materials also reveal that, from day one, FBI Special Agent (SA) Sarah J. Corcoran worked with Detective Vinton to use the federal process to overcome Ms. Ford's Fifth Amendment invocation—and she undertook several efforts to conceal their collaboration and goals.  Among other things, the materials confirm that:

- When Detective Vinton interrogated Ms. Ford on December 14, 2021, she unambiguously and unequivocally invoked her Fifth Amendment rights *seven times*, but he ignored her invocations and kept questioning her about the alleged homicide and falsely claimed she was being charged with it;

- That same afternoon, Detective Vinton texted SA Corcoran and asked her, without providing any context, "Will you file federal gun charges on her *if need be*", and SA Corcoran responded, "[I]f I can charge it, I will 100 percent";

- SA Corcoran knew that the alleged homicide had no federal nexus;

- Detective Vinton and SA Corcoran spent months coordinating Ms. Ford's federal arrest to provide him with another opportunity to interrogate Ms. Ford about the murder;

- SA Corcoran knew Ms. Ford was ignoring and did not want to speak with Detective Vinton;

- SA Corcoran believed a federal gun charge would result in Ms. Ford's pretrial detention, and offered to push her to "proffer" about the alleged homicide after she was charged;

- SA Corcoran omitted Detective Vinton's involvement from her initial 302 describing Ms. Ford's federal arrest and has not produced a recording of that interrogation, even though she expressly acknowledged in text messages to Detective Vinton that she had an obligation to record it;

1

Further, the following facts remain undisputed:

- Detective Vinton threatened Ms. Ford during her Dec. 21 interrogation with a federal prosecution;

- After Ms. Ford's federal arrest, SA Corcoran witnessed Detective Vinton expressly threaten Ms. Ford when he stated, "You see? I told you this was going to happen," and "You have one more chance to tell us who did it"; and

- According to Ms. Ford's supplemental declaration, SA Corcoran tried to question Ms. Ford about the murder and persisted in questioning even after Ms. Ford said she did not want to talk.[2]

The government nonetheless persists with this prosecution. It does so, first, by proffering SA Corcoran's non-credible claim that she had no idea what Detective Vinton was up to, even though he was texting her the same day he interrogated Ms. Ford, and asked SA Corcoran if she will file federal criminal charges against Ms. Ford "if need be." SA Corcoran's alternative explanation for what she thought he meant by that request makes no sense on its face and is not credible considering her later conduct and exchanges with Detective Vinton. In any event, even if she didn't know what Detective Vinton was up to on December 14, 2021 (she did), SA Corcoran was well aware of his misconduct on April 21, 2022, when she directly witnessed Detective Vinton threaten Ms. Ford again during her federal arrest.

In trying to avoid dismissal, the government also cites inapposite caselaw for the broad and legally unsupportable proposition that a new sovereign can wash away the sins of an old one, simply because the sovereigns are distinct. Although one sovereign is generally not responsible for the vindictiveness of another, that principle does not apply when, as here, a federal law enforcement agent is aware of, joins in, tries to cover up, and then lies about the misdeeds of a state law enforcement officer. And, contrary

---

[2] After reviewing the new discovery with Ms. Ford and learning about additional details regarding that attempted interrogation, defense counsel provided the government notice about the assertions in this supplemental declaration on August 31, 2022. (Supp. Counsel Decl. ¶ 7.)

to the government's suggestion, this Court can certainly find a presumption of vindictiveness, because the policy rationales underlying the general avoidance of doing so in pretrial filing decisions do not apply here.

Finally, even if this Court disagrees that Ms. Ford has raised viable due process or equal protection claims, this Court should nonetheless exercise its inherent authority to dismiss. That is the only way to deter future misconduct by Detective Vinton, SA Corcoran, and others like them, and it is the only way to protect the integrity of this judicial system.

## II.    NEW FACTUAL DEVELOPMENTS

## A.    The government produces new discovery that corroborates Ms. Ford's claims.

Since Ms. Ford filed her motion to dismiss, the government disclosed several reports drafted by SA Corcoran, forty pages of text messages between SA Corcoran and Detective Vinton, and an audio-recording of one of Detective Vinton's interrogations of Ms. Ford's on December 14, 2021. Because these items directly relate to, corroborate, and strengthen Ms. Ford's claims, they are described in detail below.

### 1.    Ms. Ford invokes her Fifth Amendment rights seven times.

On August 25, 2022, the government produced an audio recording of Ms. Ford's Dec. 14, 2021 interrogation.[3]  (Gov't Ex. A.)  During that interrogation, Detective Vinton tells Ms. Ford that she is under arrest for the murder. (*Id.* at 7:24.)  Shortly afterward, Detective Vinton reads Ms. Ford her *Miranda* rights and then immediately launches into his questioning. (*Id.* at 7:47–8:10.)

---

[3] As a threshold matter, that recording does not provide a complete account of Detective Vinton's interrogations of Ms. Ford. It is clear from context that Detective Vinton and Ms. Ford had previously spoken about his investigation. At the outset of the recording, Detective Vinton explains, "Obviously I told you downstairs [inaudible]." (Gov't Ex. A, at 3:27.) Ms. Ford also reviewed this recording, and she recalls that Detective Vinton had spoken with her before the interrogation occurred and had already asked her questions about the alleged homicide. (Supplemental Declaration of Brieshanay Ford, ¶ 2.)

3

Detective Vinton asks her, "So, we're handling a shooting . . . . Can you tell us what happened?" (*Id.* at 8:10–8:15.)  He asks whether Ms. Ford had been ███████ ████████████████████, to which Ms. Ford unambiguously responds by invoking her Fifth Amendment right to silence, "<u>I need a lawyer</u>." (*Id.* at 8:29–8:33.)  Detective Vinton responds, not by ending the interview, but by pivoting, "You're going to get a lawyer when you go to court." (*Id.* at 8:39.)  Ms. Ford replies, "<u>Yeah, I need one before I answer any questions</u>." (*Id.* at 8:41.)  Again, Detective Vinton does not end the interview, but asks, "So you don't want to clear your name?" (*Id.* at 8:58.)

Detective Vinton continues the interrogation. (*Id.* at 8:58–9:17.)  Frustrated, Ms. Ford states, "Yeah, this is crazy." (*Id.* at 9:17.)  Detective Vinton responds, "Yeah. Yeah it is. ████████ dead over this. ██████████████████████████████." (*Id.* at 9:18–9:24.)  Detective Vinton continues pressing Ms. Ford for information. (*Id.* at 9:24–10:14.)  Ms. Ford denies any involvement, "███████████████████████ █████████████████." (*Id.* at 10:14.)  She explains why she does not want to answer any more of his questions, "I don't want to—like I said—put myself—say nothing to put myself more in it than I shouldn't already be.  So I don't even—you know—I don't want to say the wrong thing." (*Id.* at 10:18–10:27.)  But Detective Vinton interrupts, "███████████████████████?" (*id.* at 10:29), and he continues questioning her, (*id.* at 10:29–11:42.)

Detective Vinton asks, "███████████████?" (*Id.* at 11:42.)  Ms. Ford declines to respond, and again requests a lawyer, "<u>Can I get a lawyer please</u>?" (*Id.* at 11:57.)  Undeterred, Detective Vinton continues questioning, "█████████████████████?" (*Id.* at 12:01.)  Ms. Ford again declines to respond, repeating herself, "<u>Can I get a lawyer please</u>?" (*Id.* at 12:02.)  Again, Detective Vinton pivots, "Yeah you're going to get a lawyer Tuesday. . . . ██████████████?" (*Id.* at 12:04–12:12.)  Detective Vinton continues the interrogation. (*Id.* at 12:12–12:58.)  Ms. Ford asks yet again, "<u>Can I have a lawyer please</u>?" (*Id.* at 12:58.)  This time Detective Vinton does not

4

respond for nearly thirty seconds, and simply resumes questioning, "████████ ████?" (*Id.* at 13:26–14:18.)

Detective Vinton questions Ms. Ford further about a car accident she had. (*Id.* at 14:26.) Ms. Ford again requests an attorney, "Can I get a lawyer please?" (*Id.* at 14:24.) "Do you get in accidents all the time?" he replies. (*Id.* at 14:26.) "Can I get a lawyer please?" (*Id.* at 14:27.) "You will. Yeah. Thursday." (*Id.* at 14:28.) Then, Detective Vinton makes his first thinly veiled threat and begins suggesting that he would "have to look into [Ms. Ford] hitting that car, probably hit and run or something." (*Id.* at 14:44–14:48.)

Finally, after Ms. Ford repeatedly and unambiguously invoked her right to silence at least seven times, Detective Vinton concludes the interrogation, informing her that she would be charged with the murder. "Your bail is two million for the murder," he states. (*Id.* at 15:10–15:24.)

Detective Vinton, however, did not stop questioning Ms. Ford. He drove her to the jail, and persisted in questioning her the entire ride. (Dkt. No. 36-2, Declaration of Brieshanay Ford ¶ 17.) He escorted her through processing at the jail, and continued asking her questions about the murder. (*Id.* ¶¶ 18–19.) And, as described in the moving papers, before Detective Vinton booked Ms. Ford, he turned to her and threatened her. He threatened that he would refer her unrelated gun case to his friend, SA Corcoran, for federal prosecution. (*Id.* ¶ 20.)

## 2. Detective Vinton asks SA Corcoran to file federal gun charges "if need be," and SA Corcoran says, "I will 100 percent."

On August 24, 2022, the government produced forty pages of screenshots of text messages between SA Corcoran and Detective Vinton. (Gov't Ex. B.)[4] According to

---

[4] SA Corcoran's messages appear on the right, while Detective Vinton's messages appear on the left. SA Corcoran self-selected these messages and sent them to the government, so it remains unclear whether this production represents a complete correspondence between them. According to government counsel, the timestamp that

1   those messages, on December 14, 2022, at 3:52 p.m., Detective Vinton messaged SA

2   Corcoran:

3   Detective Vinton:   Will you file federal gun charges on
                        her *if need be*
4

5   SA Corcoran:        I need a few details, but I can charge
                        it, *I will 100 percent*.
6

7   Detective Vinton:   Ok cool I'll call you *after I book her*.

8   SA Corcoran:        Cool.  I just need to know status of her
                        court cases for the gun charges
9

10  Detective Vinton:   Ok

11  . . .

12  SA Corcoran:        ███████████████████████████████

13                      ████████?

14  Detective Vinton:   ███

15  (Gov't Ex. B, at Bates 434–36) (emphases added).  These messages reveal that

16  Detective Vinton was communicating with SA Corcoran contemporaneously with his

17  threats to overcome Ms. Ford's invocation of her Fifth Amendment rights.  (*See* Ford

18  Decl. ¶ 23–24.)  SA Corcoran apparently understood that Detective Vinton was

19  speaking about Ms. Ford, and knew information about her criminal history, even

20  though he did not specify whom he was talking about.  As detailed below, this suggests

21  a strong likelihood that Detective Vinton was communicating with SA Corcoran in

22  person or over the phone immediately before, during, and after these exchanges.[5]

23

24  appears above the messages are one hour ahead of their actual transmission (*i.e.*, a
    message showing a transmission time of 4:00 p.m. was actually sent at 3:00 p.m.),
25  because SA Corcoran was in a different time zone when she screenshotted and turned
    over these messages to government counsel.
26

27      [5] SA Corcoran now claims, in a declaration in support of the government's
    opposition, that she understood Detective Vinton's referral was conditioned on the local
    district attorney's decision "not [to] pursue murder charges against her.  (Dkt. No. 41-2,
28  Declaration of Sarah Corcoran Decl. ¶ 5).  As explained below, her assertion is not
    credible.

6

Ms. Ford remained in jail for the next two days.  (Ford Decl. ¶ 27.)  Before her initial appearance on the murder, the local district attorney declined to file homicide charges, and she was finally released on December 16, 2021.  (*Id.* ¶ 28; Def. Ex. 1, at Bates 212.)  Shortly after Ms. Ford was released, SA Corcoran called Detective Vinton.  (*See* Gov't Ex. B, at Bates 436 (text message dated Dec. 16, 2021, at 2:27 p.m., Detective Vinton stating, "I'll call you back.").

### 3.   SA Corcoran arrests Ms. Ford so that she and Detective Vinton can interrogate her about the alleged homicide and pressure her to submit to a "proffer."

Over the next few months, Detective Vinton and SA Corcoran contacted one another continuously about Ms. Ford's federal arrest and to arrange for another interrogation regarding the homicide.  (*See* Gov't Ex. B, at Bates 434–73; *see also* Defense Exhibit 6 (emails between Detective Vinton and SA Corcoran).)

On March 22, 2022, for instance, Detective Vinton texted SA Corcoran, asking, "Did you want to try and arrest ford [sic] tomorrow still."  (Gov't Ex. B, at Bates 455.)  However, the federal arrest warrant, according to SA Corcoran, was not yet ready.  (*Id.*) ("AUSA hopes to have a warrant in hand on Friday.  (She got busy . . . allegedly [shrug emoji]).").  After SA Corcoran filed a complaint against Ms. Ford, she asked Detective Vinton, on April 5, 2022, "If we can grab Ford tomorrow do you want to interview her again?"  (*Id.* at Bates 458–59.)  Detective Vinton replies, "Yes if possible."  (*Id.*)  The next day, SA Corcoran lets Detective Vinton know, "I'll have to record the interview . . . ."  (*Id.*)  The two coordinate around who will bring the recording device.  (*Id.*)

SA Corcoran acknowledged that she wanted to interrogate Ms. Ford about the murder as well, even though it had nothing to do with the gun case (and federal jurisdiction for murder is extremely narrow).  For instance, in preparing to arrest Ms. Ford, she texts Detective Vinton on April 5, 2022, "If we can grab Ford tomorrow do you want to interview her again?  If not I will likely just do a quick interview in the back of the car and push for a proffer at a later date, which you will obviously be at."

(*Id.* at Bates 458.)  The next day, SA Corcoran asked Detective Vinton for a copy of the affidavit he filed in support of her arrest.  (*See* Gov't Ex. B, at Bates 460 (Apr. 6, 2022 text, at 8:02 a.m., stating "████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████.").)

Because of some unexpected logistical delays, SA Corcoran was not able to arrest Ms. Ford until April 21, 2022, however.  After the arrest, SA Corcoran arranged to have Detective Vinton come interview Ms. Ford.  (*See Id.*, at Bates 468.)  That day, SA Corcoran texted Detective Vinton, "In custody."  (*Id.*)  He replied, "Nice."  (*Id.*)  "Meet you at van nuys," *id.*, meaning the Van Nuys Courthouse, (*Id.*; *see also* Gov't Ex. C, at Bates 429.)

Initially, SA Corcoran did not disclose in her official report that Detective Vinton was present during that interrogation.  (*See* Gov't Ex. C.)  On April 24, 2022, a few days after Ms. Ford's arrest, SA Corcoran drafted a 302 describing the arrest.  (*Id.*, at Bates 429–30.)  SA Corcoran provided various details about that day, such as where Ms. Ford was intercepted and held, how her property was handled, names of the officers who searched her, and other timestamps and odometer readings.  (*See id.*)  SA Corcoran did not, however, mention Detective Vinton's presence or their attempted interrogation of Ms. Ford.  (*See id.*)  These details were not disclosed until after Ms. Ford filed her moving papers—where defense counsel stated that we had spoken directly to Detective Vinton and subpoenaed the LAPD.  (And, even though it was dated April 25, 2022, the government did not produce this 302 to defense counsel until after Ms. Ford filed her motion to dismiss.  An explanation for that belated disclosure has still not been provided, despite repeated requests.)[6]

---

[6] Several times, defense counsel asked the government why this item had not been produced to the defense earlier, despite defense counsel's repeated inquiries about the federal arrest and the government's representations at the status conference that all discovery had been produced, but, to date, the government has not provided an explanation.  (Supp. Counsel Decl. ¶ 6.)

Then, on August 18, 2022, and well after Ms. Ford provided her account of what happened, the government produced a newly drafted 302.  In that report, SA Corcoran acknowledges for the first time that Detective Vinton was present during her federal arrest.  She states that "LAPD Detectives attempted to speak with Ford and expressed their interest in talking about their ongoing investigation in which Ford was believed to be a witness." (Gov. Ex. D, at Bates 433.)  She also states that "[b]ody cameras are not assigned to any members of the arresting team," but does not state whether anyone recorded the interrogation.  (*Id.*)  And, although SA Corcoran knew FBI policy required her to record the interrogation,[7] the government has not produced a copy of that recording to the defense or affirmatively disclaimed its existence.  (Supplemental Declaration of Counsel ¶¶ 2, 6.)

SA Corcoran's newly drafted 302 does not provide a full account of that attempted interrogation, however, and it omits pertinent details.  (Gov't Ex. D, at Bates 433.)[8]  According to Ms. Ford's supplemental declaration, both Detective Vinton *and* SA Corcoran questioned Ms. Ford—not just "LAPD Detectives," as SA Corcoran stated.  (Supp. Ford Decl. ¶ 4.)  Notably, neither SA Corcoran nor Detective Vinton asked Ms. Ford any questions about her alleged possession of a firearm, the purported basis of this federal prosecution.  (*Id.*)  Instead, they focused exclusively on the murder.  (*Id.*)  Ms. Ford immediately said that she did not want to speak to them.  (*Id.*)  SA Corcoran then asked Ms. Ford, "Are you sure you don't want to talk with us?"  (*Id.*)  Ms. Ford said that she did not want to talk.  (*Id.*)

Despite Ms. Ford's invocation, SA Corcoran and Detective Vinton continued to question Ms. Ford for about ten minutes, and each were "piggy backing off" each

---

[7] (*See* Gov't Ex. B, at Bates 458–59 (SA Corcoran texting Detective Vinton, stating, "I'll have to record the interview so whatever room you set up, let me know if there is recording capabilities / If not, I'll bring a recording.").)

[8] SA Corcoran's original 302, drafted on April 24, 2022, described the arrest but conspicuously omits any reference to this interview or Detective Vinton's presence. (Gov't Ex. C, at Bates 429–30.)

9

other's questions.  (*Id.*)  Detective Vinton promised that whatever Ms. Ford said would be "off the record."  (*Id.* ¶ 5.)  Still, Ms. Ford refused to talk.  (*Id.*)  Detective Vinton told Ms. Ford, "You see?  I told you this was going to happen."  (*Id.* ¶ 7; Ford Decl. ¶ 37.)  He also said, "You have one more chance to tell us who did it."  (Supp. Ford Decl. ¶ 7; Ford Decl. ¶ 36.)  These threats were made in SA Corcoran's presence. (Supp. Ford Decl. ¶ 7.)  Neither the government nor SA Corcoran dispute that Detective Vinton made these statements.  And, although SA Corcoran witnessed him make these statements, SA Corcoran did not include this information in her declaration or any official report.

### 4.    SA Corcoran hoped that a federal arrest would provide an opportunity to detain Ms. Ford.

After SA Corcoran and Detective Vinton failed to overcome Ms. Ford's Fifth Amendment rights, Ms. Ford made her initial appearance in federal court.  SA Corcoran apparently observed that hearing and provided Detective Vinton with live updates as it was underway.  "Oh man!" she exclaimed at one point, "They are arguing for detention. They never go back and forth like this."  (Gov't Ex. B, at Bates 470.)  SA Corcoran provided one final update: "Judge Wilner held that we did not meet our burden to establish we're entitled to a detention hearing so, he is letting Ford out on Bond."  (*Id.* at Bates 471.)  "I think this is the first case I've ever had where my subject wasn't detained."  (*Id.*)

### B.    The government refuses to provide any context for the new disclosures.

After the government produced the text messages, audio recordings, and new 302s, defense counsel posed a series of questions to the government.  Specifically, defense counsel emailed government counsel, asking:

- What time did the interrogation of Ms. Ford occur;[9]

---

[9] This fact is important to determine the context and timing of Detective Vinton's initial text message to SA Corcoran.

- What was Detective Vinton referring to when he texted SA Corcoran, in a partially faded message, "What a dumb statement," (*see* Gov't Ex. B, at Bates 455 (top-left corner));

- Why did SA Corcoran initially leave out Detective Vinton's presence in the 302 she drafted on April 24, 2022, (*see* Gov't Ex. C, at Bates 429–30), despite texting him extensively to arrange for his presence and arrival during Ms. Ford's arrest, (*see, e.g.*, Gov't Ex. B, at Bates 458);

- Why did SA Corcoran not record the interrogation, despite knowing that she knew she had a duty to record, (*see id.*, at Bates 458–59);

- What was the conversation SA Corcoran had with Detective Vinton before he asked her, "Will you file federal gun charges on her if need be", and she responded, "[I]f I can charge it, I will 100 percent"?  (*See id.*, at Bates 437); and

- Did SA Corcoran believe that federal charges would ensure that Ms. Ford would be held in detention pending these charges, and thus increase the likelihood of her proffering on the murder investigation?  (*See id.*, at Bates 470 (SA Corcoran stating, "Oh man!  They are arguing for detention.  They never go back and forth like this."); *see also id.*, at Bates 458 ("I will . . . push for a proffer at a later date, which you will obviously be at.").)

(Supp. Counsel Decl. ¶ 3.)

Defense counsel also reiterated Ms. Ford's prior discovery requests, including the request for all call logs between SA Corcoran and Detective Vinton.  (*Id.* at ¶ 4.)  Given SA Corcoran's efforts to conceal Detective Vinton's involvement and their attempted interrogation during Ms. Ford's federal arrest, defense counsel also asked the government to conduct a Cellebrite extraction of SA Corcoran's phone to ensure she had not deleted any of her messages with Detective Vinton.  (*See id.* at ¶ 3.)  And, on August 31, 2022, defense counsel explained why we believed SA Corcoran's denial of knowledge of Detective Vinton's investigation is not credible.  (*Id.* at ¶ 5.)  As of the time of this filing, the government has refused to provide this information.  (*Id.* at ¶ 6.)

1

2

### C.     Defense counsel obtained complaints regarding Detective Vinton's history of misconduct.

3

4

5

6

7

8

In addition to the misconduct cited by Ms. Ford in her motion to dismiss, (Mot. at 6–8), defense counsel obtained copies of the complaints against Detective Vinton, which detail his habit of retaliating against people, in shocking ways, after they refuse to provide him with information.  According to those complaints, many of which ended in settlements, Detective Vinton often used illegal means to extract information from people and engaged in other police misconduct.[10]

9

#### 1.     *Tenorio*:  Retaliation and release in exchange for information

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

In August 1998, then-Officer Vinton was sued for falsely arresting a sixteen-year old child and committing perjury against him.  *Tenorio v. City of L.A.*, Dkt. No. 1 ¶ 11, 2:00-cv-06177-GAF-AJWX (C.D. Cal. 2000).  There, the plaintiff was walking home after purchasing a fan for his mother.  *Id.*  Officer Vinton and his partner approached the plaintiff and ordered him to stop.  *Id.*  The plaintiff's mother approached and asked Officer Vinton why they were harassing her son.  *Id.* ¶ 12.  Officer Vinton pointed his finger at the plaintiff's mother and told her to shut up.  *Id.*  The plaintiff asked Officer Vinton not to talk to his mother in that manner.  *Id.*  Infuriated, Officer Vinton replied, "Oh you, want to talk too?"  *See id.*  Officer Vinton then "handcuffed plaintiff, grabbed plaintiff's jaw and slammed his body against the wall," *id.*, and arrested him.  *Id.* ¶ 13.  On the way to the police station, Officer Vinton said, "We aren't taking you because you did anything wrong, we are taking you because your mom likes to talk a lot of shit."  *Id.*  Officer Vinton then asked the plaintiff if he would provide information, and, in return, the plaintiff would be released.  *Id.*  The plaintiff declined to give any information, and he was subsequently falsely arrested for violating curfew, wearing

25

26

27

28

_____

[10] As noted in Ms. Ford's moving papers, despite diligent efforts, and due to their age, counsel was unable to obtain copies of the complaints before the filing deadline. (Mot. at 7 n.9.)  Defense counsel has since acquired and accordingly describes them here, and apologizes for their belated disclosure.  The dockets and complaints to these are attached as Defense Exhibit 7, in the order in which they are described here.

gang attire and associating with gang members. *Id.* The plaintiff was not wearing gang attire, was not associating with any gang members, and was not in violation of curfew. *Id.* As a result of Officer Vinton's perjured testimony, the plaintiff was found guilty of violating his terms of probation and was wrongfully caused to spend thirteen months incarcerated in a juvenile facility. *Id.* ¶ 15.

On October 16, 2006, the district court dismissed the action because the parties reached a settlement.

### 2. *Humphrey*: Planting evidence after plaintiff declines to provide information

According to another lawsuit, in August 1998, Officer Vinton and another officer, without cause, kicked down the door to plaintiff's residence. *Humphrey v. City of L.A.*, 2:03-cv-02623-DDP-FMO, Docket 39, pp. 7–8 (C.D. Cal. 2003). The force of the door knocked the plaintiff to the ground. *Id.* at 8. Officer Vinton entered and handcuffed the plaintiff. *See id.* Though the plaintiff was naked, officers left the door open such that onlookers could and did see the plaintiff, humiliating him. *Id.* Officer Vinton interrogated the plaintiff, seeking information about gang activities. *Id.* When the plaintiff did not provide satisfactory information, the officers planted narcotics and arrested him. *Id.* On March 22, 2000, the resulting charges against the plaintiff were dismissed. *Id.* The district court dismissed the action because it was procedurally barred by Supreme Court precedent under *Heck v. Humphrey*, 512 U.S. 477, 487 (1994).

### 3. *Godinez*: Excessive force and planting evidence after plaintiff declines to provide information.

In August 1997, another plaintiff sued then-Officer Vinton for police brutality and planting narcotics on him. *Godinez v. City of L.A.*, 2:00-cv-08962-GAF-AJWX at ¶ 16 (Aug. 23, 2000). Specifically, the lawsuit claimed that Officer Vinton and his partner unlawfully entered the plaintiff's home, where he was sleeping, with the sole intention of extracting gang activity information from the plaintiff. *Id.* The plaintiff

13

was unable to provide information acceptable to Officer Vinton, and, as a result, the officers "brutally and without cause kicked and punched Plaintiff in the face and body." *Id.* Officer Vinton "intentionally failed to and did refrain from providing medical assistance to Plaintiff after they ceased beating him." *Id.* ¶ 17. The plaintiff's claims, however, were procedurally barred under *Heck* or otherwise dismissed for exceeding the statute of limitations.

### 4. *Herrera*: Excessive force following refusal to provide information.

In August 1997, yet another plaintiff sued Officer Vinton. There, the plaintiff claimed that Officer Vinton arrested him for an alleged curfew violation, although it was only 8:00 p.m. *Herrera v. City of L.A.*, 2:00-cv-12531-GAF-AJW ¶ 14 (C.D. Cal. 2000). Officer Vinton transported the plaintiff down to the precinct and began to interrogate him regarding local gang activity. *Id.* Officer Vinton showed the plaintiff a chrome pistol and threatened, if plaintiff should refuse to give him information, he would plant the gun on the plaintiff. *Id.* Officer Vinton instructed the plaintiff to pick up the gun from the table where he placed it, but the plaintiff refused. *Id.* When he did, Officer Vinton grabbed the plaintiff by the neck and beat him. *Id.* The action was dismissed because the plaintiff's lawyer failed to prosecute the case.

### 5. Other lawsuits: More dishonesty and conduct unbecoming of a law enforcement officer.

In addition to the above allegations, Detective Vinton has, according to other plaintiffs, repeatedly falsified arrests by planting contraband on innocent people. *See Corrales v. City of L.A.*, 2:03-cv-00910-GAF-AJWX (C.D. Cal. 2003) (**settled**) (planted narcotics and resulting criminal conviction overturned); *Moore v. City of L.A.*, 2:02-cv-05355-GAF-AJWX ¶¶ 9–19 (C.D. Cal. 2002) (**dismissed by parties' stipulation**) (falsely claimed plaintiff possessed contraband, planted the evidence, resulting criminal charges dismissed); *Padilla v. City of L.A.*, 2:02-cv-05631-PA-EX ¶¶ 10–12 (C.D. Cal. 2002) (**settled**) (planted narcotics on the plaintiff and resulting

14

conviction invalidated); *Carrington v. City of L.A.*, 2:01-cv-07432-GAF-AJWX ¶ 13–18 (C.D. Cal. 2001) (**settled**) (excessive force, false arrest, planting of evidence, resulting conviction overturned); *Rodriguez v. City of L.A.*, 2:00-cv-09218-GAF-AJWX ¶ 8 (C.D. Cal. 2000) (disposition unclear, though it appears to have been voluntarily dismissed after mediation) (planted evidence).

## III.   ARGUMENT

Based on the above facts, Ms. Ford has provided ample reasons to dismiss this case because the government violated Ms. Ford's due process and equal protection rights by engaging in vindictive enforcement, vindictive prosecution, selective enforcement, and outrageous government conduct.  Contrary to the government's arguments, this Court can impute Detective Vinton's and SA Corcoran's vindictiveness to the government, and it can find a presumption of vindictiveness.  Further, even if this Court does not believe Ms. Ford has raised a valid due process or equal protection claim, it should dismiss under its inherent authority.

Additionally, the government's efforts to distance itself from Detective Vinton are also not persuasive.  SA Corcoran knew about and was fully involved in Detective Vinton's misconduct.  At a minimum, this Court should grant Ms. Ford's motion to compel, hold an evidentiary hearing, and provide her with an opportunity to supplement her briefing after receiving the subpoenaed materials.

## A.   SA Corcoran's purported lack of knowledge about Detective Vinton's threats and motives is not credible.

The government now claims that, despite SA Corcoran's extensive collaboration and coordination with Detective Vinton, she had no idea what Detective Vinton was up to and knew nothing about Detective Vinton's threats.  (Corcoran Decl. ¶ 7).  SA Corcoran further claims that she did not know that Detective Vinton believed federal prosecution would aid his effort to overcome Ms. Ford's Fifth Amendment invocation, when he texted her, "Will you file federal charges against her *if need be*."  Instead, according to SA Corcoran, she "understood Detective Vinton's message to mean that

15

he was asking whether the FBI would pursue federal firearm charges against defendant if the district attorney did not pursue murder charges against her." (*Id.* ¶ 5.) Not only is her assertion not credible on its face, it is not credible because she indisputably witnessed Detective Vinton threaten Ms. Ford during her federal arrest.

### 1. SA Corcoran directly witnessed Detective Vinton make threats.

As a threshold matter, even if this Court takes SA Corcoran's word, which it shouldn't, SA Corcoran eventually developed knowledge of Detective Vinton's threatening activity and joined in it. When Detective Vinton tried to interrogate Ms. Ford during her federal arrest, he told Ms. Ford, "You see? I told you this was going to happen," and, "You have one more chance to tell us who did it." (Ford. Decl. ¶¶ 36–37; Supp. Ford Decl. ¶ 7.) That is an explicit threat, which references a history of other similar explicit threats. SA Corcoran heard Detective Vinton make that threat. She did not admonish Detective Vinton or explain to Ms. Ford that his threats had no bearing on her gun case. Neither the government nor she disputed that Detective Vinton made these threats. And Ms. Ford confirms that SA Corcoran was present when Det. Vinton made these threats. (Supp. Ford Decl. ¶ 7.)

Thus, even setting aside SA Corcoran's claim that she didn't know about Detective Vinton's threats beforehand, at the very least, SA Corcoran knew *by that point* that Detective Vinton threatened Ms. Ford, and she allowed Ms. Ford to continue to be questioned. Further, SA Corcoran witnessed these threats before the United States Attorney's Office (USAO) presented evidence to a federal grand jury, where SA Corcoran likely testified. If SA Corcoran related this to the charging Assistant United States Attorney (AUSA), then the USAO was directly aware of the threats. However, even if she concealed that information from the USAO, such conduct is extremely suspicious and casts further doubt on the overall credibility of her remaining claims.[11]

---

[11] For the same reasons, the government's argument that Ms. Ford has not shown "discriminatory purpose" in favor of her selective enforcement claim is unavailing.

1

2

### 2.      SA Corcoran knew that Ms. Ford did not want to talk to Detective Vinton.

3       SA Corcoran knew that the federal arrest would have given Detective Vinton

4   another opportunity to interrogate Ms. Ford—and SA Corcoran made every effort to

5   advance that endeavor.  SA Corcoran's efforts do not make sense unless she knew that

6   Ms. Ford had invoked her Fifth Amendment rights.  Had Ms. Ford waived her rights

7   and made herself available for questioning, for instance, SA Corcoran would have no

8   reason to arrange for Detective Vinton's presence during the federal arrest.  SA

9   Corcoran offers no credible reason for why she sought to use a federal arrest—as

10  opposed to a voluntary interview—to facilitate this effort.  The only reasonable

11  inference is that SA Corcoran knew Ms. Ford had invoked her Fifth Amendment rights,

12  but that a federal criminal prosecution might enable Detective Vinton to overcome that

13  invocation.

14       The text messages reinforce this understanding.  As those messages demonstrate,

15  SA Corcoran knew that Detective Vinton remained in continuous contact with

16  Ms. Ford.  (*See, e.g.*, Gov't Ex. B, at Bates 455 (Text message dated Mar. 15, 3:47

17  p.m., SA Corcoran asking, "Ford come in today?").)  And SA Corcoran knew Ms. Ford

18  was avoiding Detective Vinton.  (*See, e.g.*, *id.* at Bates 457 (Text message dated Mar.

19  31, 6:30 a.m., Detective Vinton stating, "She isn't responding to my texts")); (*Id.* at

20  Bates 461 (Text message dated Apr. 6, 8:02 a.m., Detective Vinton asking, "Do you

21  want me to ping her phone").)  SA Corcoran also knew Detective Vinton had already

22  tried, but failed, to interrogate her.  (*See id.* at Bates 458–59 ("If we can grab Ford

23  tomorrow do you want to interview her *again*?") (emphasis added).)  SA Corcoran does

24

_____

25  (*See* Opp. at 14–15.)  SA Corcoran *did* act with a discriminatory purpose by knowing
    about, carrying out, and helping facilitate Detective Vinton's explicit threats.  Besides,
26  Detective Vinton provided SA Corcoran with police reports and other information
    regarding Ms. Ford's November 23, 2021 arrest, so he was not merely an "unrelated
27  government entity," as the government suggests.  (Opp. at 14.)  He furnished her with
    evidence in support of the gun prosecution and arranged for her to inspect it.  (Ex. 6, at
28  Bates 474–95.)  He held the ammunition and transported it to her.  (Gov't Ex. B at
    Bates 449–53.)

not deny any of this.  In her own words, SA Corcoran "knew that [Detective Vinton's] murder investigation was still open, and [she] therefore advised him when Ford was going to be federally arrested on April 21, 2022, so that he could attempt to interview her."  (Corcoran Decl. 9.)

### 3.   SA Corcoran tried to conceal Detective Vinton's involvement because she knew she was doing something wrong.

SA Corcoran's attempts to hide Detective Vinton's involvement and motives further undermine her credibility.  After SA Corcoran arrested Ms. Ford, she and Detective Vinton tried to question Ms. Ford about the murder, even after Ms. Ford invoked her rights.  Ms. Ford made it clear she did not want to talk to them about that subject, but SA Corcoran nonetheless asked Ms. Ford, "Are you sure you don't want to talk with us?"  (Supp. Ford Decl. ¶ 7.)  Ms. Ford said no, but SA Corcoran and Detective Vinton kept asking her questions.  (*Id.*)

SA Corcoran's efforts to conceal this interaction strongly suggest consciousness of wrongdoing.  For one, under DOJ policy, SA Corcoran should have recorded the interrogation.  *See* Dep't of Justice Manual, § 9-13.001 (requiring recording unless an exception applies).  And, under that policy, "[a] decision not to record . . . *must be documented* by the agent as soon as practicable." *Id.* (emphasis added).  SA Corcoran knew about these policies, but she either (i) chose not to record the interrogation, which would be strange since she explicitly recognized that obligation, (*see* Gov't Ex. B, at Bates 458); or (ii) she *did* record the interrogation, but hasn't turned that recording over.  Several facts support an inference that (ii) is a fair inquiry: SA Corcoran has never affirmatively stated that she didn't record the attempted interrogation; that assertion is conspicuously absent in her declaration, and she phrased the point strangely in the 302, dated August 17, 2022, when she noted the absence of "body cameras" only, but said nothing about audio recordings.  (*See* Gov't Ex. D, at Bates 433.)  And, contrary to DOJ policy, SA Corcoran never "documented" her "decision not to record [the] interview."  *See* Dep't of Justice Manual, § 9-13.001.

Instead, SA Corcoran decided not only to omit the decision to record the interrogation, but the entire interaction altogether.  Shortly after Ms. Ford was arrested, SA Corcoran drafted a 302 describing the arrest.  (*See* Gov't Ex. C, at Bates 429–30.)  She provides quite some detail, such as where Ms. Ford was intercepted and held, how her property was handled, the names of other officers involved in the arrest, and other timestamps and odometer readings.  (*See id.*)  Yet she chose to omit Detective Vinton's presence and their attempted interrogation.  Why?  SA Corcoran chose not to disclose these details until after defense counsel filed the opening motion—where we stated that we had spoken directly to Detective Vinton and subpoenaed the LAPD.  SA Corcoran's inclination to hide these details raises a clear inference of irregularity and impropriety.

In a similar vein, the government's discovery now shows that Detective Vinton lied to defense counsel, too.  Detective Vinton claimed he could not recall whether Ms. Ford invoked her Fifth Amendment rights, even though she did so at least seven times.  (Mot. at 12.)  He claimed he did not know who referred Ms. Ford's state case to SA Corcoran because there were about twenty other homicide detectives in his unit, despite the months of correspondence he had with SA Corcoran.  (*Id.*)  And he falsely denied not being present during Ms. Ford's federal arrest.  (*Id.*)  Detective Vinton's attempts to distance himself from his contact with SA Corcoran and involvement in this federal prosecution bolster the view that they both knew their conduct was inappropriate and, likely, that his misconduct could reveal SA Corcoran's misconduct, too.

### 4.    SA Corcoran was involved from day one.

The timing of SA Corcoran's involvement also strongly suggests that she knew about Detective Vinton's threats.  Even though Detective Vinton did not name anyone in his initial text to her, SA Corcoran knew exactly who and what he was talking about.  (*See* Gov't Ex. B, at Bates 434–36.)  SA Corcoran did not ask Detective Vinton, "Who are you talking about?" or, "What do you mean by that?"  Instead, SA Corcoran

responded, "Cool.  I just need to know status of her court cases for the *gun charges*." (*Id.* (emphasis added).)  She knew not only who his text messages referred to, but also that Ms. Ford had pending state gun charges.  Unprompted, SA Corcoran asked, "███ ████████████████████████████████████?"  (*Id.* at Bates 436.)  SA Corcoran's understanding suggests that she and Detective Vinton had communicated almost immediately before, during, or after his failed attempts to interrogate her.[12]

> ### 5.   SA Corcoran herself wanted to interrogate Ms. Ford about the murder—and thought the federal arrest would help crack her.

SA Corcoran herself wanted to interrogate Ms. Ford about the murder, even though it had nothing to do with the federal gun charges.  She asked Detective Vinton for a copy of the affidavit he filed in support of her arrest.  (*See* Gov't Ex. B, at Bates 460 (Apr. 6, 2022 text, at 8:02 a.m., stating "█████████████████████████████ ██████████████████████████████████████████ ████████████████.")[13]  She even mentioned that she would conduct an interrogation about the murder by herself if Detective Vinton could not make it for the arrest.  ( *See id.* at Bates 458 (SA Corcoran texting Detective Vinton on April 5, 2022, "If we can grab Ford tomorrow do you want to interview her again?  If not I will likely just do a quick interview in the back of the car and push for a proffer at a later date, which you will obviously be at.").)

Further, SA Corcoran's messages reveal that she believed Ms. Ford would be detained while her federal charges were pending.  Once in custody, SA Corcoran reports to Detective Vinton, "Oh man! They are arguing for detention. They never go back and forth like this."  (*Id.* at Bates 470.)  Dismayed, SA Corcoran writes, "Judge Wilner held that we did not meet our burden to establish we're entitled to a detention

---

[12] Defense counsel has requested SA Corcoran's call logs from December 14, 2021, but the government has refused to disclose them.  (Supp. Counsel Decl. ¶¶ 3–4, 6.)

[13] A copy of the affidavit in support of this warrant has still not been produced to the defense.

1  hearing so, he is letting Ford out on Bond." (*Id.* at Bates 471.)  "I think this is the first

2  case I've ever had where my subject wasn't detained." (*Id.*)  SA Corcoran believed

3  that, unlike the local gun prosecution, Ms. Ford would be detained pending trial in the

4  federal matter, thus making her more susceptible to submitting to a proffer with

5  Detective Vinton's investigation.  The sole reason to take, and keep, Ms. Ford in

6  federal custody was to overcome Ms. Ford's Fifth Amendment invocation.

### 6.    SA Corcoran and Detective Vinton spoke extensively and continuously with one another.

9  The consistency and extent of SA Corcoran's contact with Detective Vinton

10  communications also strongly suggest that SA Corcoran knew about his threats.  Both

11  the government and SA Corcoran attempt to minimize the degree to which she worked

12  closely with Detective Vinton, (*see, e.g.*, note 14, below), but it is clear they spoke

13  extensively about Ms. Ford.  (*See* Gov't Ex. B, at Bates 434–73; Ex. 6.)  They worked

14  in the same office building and spoke about this case over the phone and in person.

15  (Corcoran Decl. ¶ 2.)  For instance, on the same day that the district attorney declined

16  to charge Ms. Ford with murder, Detective Vinton emailed and texted SA Corcoran,

17  and they talked on the phone.  (*See* Gov't Ex. B, at Bates 436 (Vinton stating, "I'll call

18  you back.").)  It is not credible that SA Corcoran did not ask about what happened

19  during the interrogation or that Detective Vinton did not otherwise tell her that

20  Ms. Ford invoked her rights.  Their continuous contact makes it likely that Detective

21  Vinton would have shared the details of his interrogation with SA Corcoran.

### 7.    SA Corcoran's purported "understanding" makes no sense.

23  The above is enough to call SA Corcoran's overall credibility into serious

24  doubt.  But even without the above, SA Corcoran's alternative explanation for what

25  Detective Vinton meant when he asked her to file charges "if need be" also makes no

26  sense, not only on its face but based on their subsequent communications and

27  conduct.  It is difficult to understand the logical connection between a state prosecutor's

28  decision that there was no probable cause Ms. Ford had committed a murder, on the

one hand, and how that would necessitate the filing of unrelated federal charges against her, on the other hand—*unless* the federal charges would enable them to crack Ms. Ford's invocation.  This is the simplest, most logical explanation and therefore the most probable one.  And, despite this obvious explanation, neither the government nor SA Corcoran attempt to explain how SA Corcoran arrived at her own purported understanding.[14]  They just expect this Court to accept her assertion at face value.

**B.    This Court should impute SA Corcoran's and Detective Vinton's vindictive intent to the USAO.**

The government does not—and cannot—dispute that SA Corcoran actively assisted Detective Vinton's murder investigation.  (*See* Opp. at 13.)  As detailed above, SA Corcoran colluded with Detective Vinton in his unconstitutional effort to circumvent Ms. Ford's constitutional rights, and she witnessed his threats firsthand during her federal arrest.  But even if this Court credits SA Corcoran's denial of knowledge about Detective Vinton's threats, it can still impute Detective Vinton's vindictive motivation to the federal prosecution.

To begin, the government misconstrues Ninth Circuit precedent in suggesting that "[i]mproper motive cannot be imputed from one sovereign to another."  (Opp. at 17.)  In support of this conclusion, the government cites an incomplete portion of the holding in *United States v. Robison*, 644 F.2d 1270, 1273 (9th Cir. 1981).  There, the court recognized that, in general, a prosecution occurring in a different jurisdiction from where the vindictiveness originated is one factor that tends to diminish a claim of vindictiveness.  *Id.*  The court did not, however, go as far as the government wants to go—and expressly declined to do so.  *Id.*  *Robison* actually expressly left open that

---

[14] SA Corcoran simply asserts, without specifying, that her that understanding was based on prior conversations she had with Detective Vinton about his murder investigation into Ms. Ford.  (Gov't Opp. Corcoran Decl. ¶ 3, 5.)  SA Corcoran tries to minimize those prior conversations, characterizing them as a mere "mention" made "[s]ometime prior to December 14, 2021."  (*See id.* ¶ 3.)  But the text messages suggest that their communications were happening contemporaneously, continuously, and frequently.

possibility.  In full, the court stated, "Though we *do not now hold* that a second

prosecution can never be vindictive when it follows a successful defense in a foreign

jurisdiction, we do hold the involvement of separate sovereigns tends to negate a

vindictive prosecution claim."  *Id.* (emphasis added); *see also United States v. Burt*,

619 F.2d 831, 837 (9th Cir. 1980) (declining to address whether vindictive intent may

be imputed from one sovereign to another).  Or, put simply, the court has consistently

left open the possibility that, under the right circumstances, a prosecution *can* be

vindictive even if the vindictiveness originated in a separate jurisdiction.

Notably, just twelve days after deciding *Robison*, the Ninth Circuit imputed

vindictiveness from one prosecutor's office to another, and it specifically rejected the

government's arguments that the offices' respective independence laundered the

vindictiveness.  *See United States v. Hollywood Motor Car Co., Inc.*, 646 F.2d 384, 387

(9th Cir. 1981), *rev'd on other grounds*, 458 U.S. 263 (1982) (per curiam) (finding that

vindictive prosecution may lie "in cases involving separate prosecutors' offices");[15] *see*

*also United States v. DeMarco*, 550 F.2d 1224, 1227–28 (9th Cir. 1977).  That is

because any other conclusion would "unreasonably restrict" the vindictiveness doctrine.

*Hollywood Motor Car Co.*, 646 F.2d at 387.

---

[15] The government contends that because *Hollywood Motor Car* was reversed on other grounds that it is "neither binding nor persuasive authority," but conspicuously cites no authority for that proposition.  (Opp. at 20 n. 5.)  In any event, the Ninth Circuit and other courts in this circuit have repeatedly cited the relevant portions of *Hollywood Motor Car.  See, e.g., United States v. Jenkins*, 504 F.3d 694, 699 (9th Cir. 2007); *United States v. Dohm*, 62 F.3d 1426 (9th Cir. 1995); *see also United States v. Toomer*, 2018 WL 3745815, at *2 (D. Nev. Aug. 6, 2018); *United States v. Love*, 2011 WL 1326013, at *2 (S.D. Cal. Apr. 6, 2011), *aff'd*, 642 F. App'x 700 (9th Cir. 2016); *United States v. John*, 2012 WL 1842789, at *4 (D. Ariz. May 21, 2012); *United States v. Kahre*, 2009 WL 10715474, at *11 (D. Nev. Apr. 21, 2009).

Notably, even the government has cited *Hollywood Motor Car* as good authority in other circuits.  *See, e.g., United States v. Meyer*, 810 F.2d 1242, 1249 (D.C. Cir. 1987), *reh'g en banc granted, opinion vacated*, 816 F.2d 695 (D.C. Cir. 1987), and *opinion reinstated on reconsideration sub nom. Bartlett on Behalf of Neuman v. Bowen*, 824 F.2d 1240 (D.C. Cir. 1987) ("[T]he government cites several cases in which courts have declined to order any relief other than dismissal of the vindictively motivated charge.") (citing *Hollywood Motor Car*, 646 F.2d at 388–89).

23

The government wants to "unreasonably restrict" the vindictiveness doctrine here, but it cites no case presenting facts as egregious as the ones here.  For instance, the government cites *United States v. Hooton*, 662 F.2d 628, 633 (9th Cir. 1981), but that case involved fundamentally different facts.  There, the defendant claimed he was being targeted criminally just because he had filed a civil lawsuit against a federal agent and the agent's close friend.  *Id.*  Unlike here, the defendant's allegations of vindictiveness were conclusory: he claimed, without any supporting facts, that the agent referred him for federal prosecution simply because of his civil suit and because the agent was "angered" that he had also sued one of his close friends.  *Id.*  The defendant provided no direct evidence of vindictiveness, such as direct threats, however.  *Id.*  And, notably, the court held an evidentiary hearing wherein the agent denied the allegations, and the defendant did nothing to undermine those denials.  *Id.* That situation stands in stark contrast to the one here.  Here Ms. Ford has provided direct evidence of Detective Vinton's threats and SA Corcoran's knowledge of, participation in, and efforts to cover up those threats.  Further, the AUSAs here continued to carry out those motives when they asked Ms. Ford to submit to a proffer about the alleged homicide.

The government also relies heavily on *United States v. Lopez*, 474 F.3d 1208, 1212 (9th Cir. 2007), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012), but that case is similarly inapplicable here.  In *Lopez*, local police officers arrested the defendant, a suspected gang member, for possessing methamphetamine and guns.  *Id.* at 1210.  The defendant was charged in state court. *Id.*  Meanwhile, federal agents referred the case for federal prosecution, and a federal prosecutor had already "accepted the case for prosecution pending further investigation."  *Id.*  Thereafter, federal agents became interested in obtaining information about the gang and initiated a series of interviews with the defendant.  *Id.* One federal agent interviewed the defendant about his knowledge of the gang, and the agent advised defendant that he "could be looking at serious federal time" unless he

cooperated. *Id.* The defendant refused to cooperate, and a federal grand jury indicted him on charges of possession of the methamphetamine and guns. *Id.* The defendant moved to dismiss for vindictive prosecution. *Id.* at 1211.

The court declined to find that the federal prosecution was vindictive. The court recognized that "[a] prosecutor, and presumably field officers too, may threaten a defendant with prosecution during an interview or plea negotiations, and if that defendant chooses not to cooperate or plead guilty, the prosecutor is free to initiate a prosecution." *Id.* at 1212. The court explained, "the FBI's threat of 'serious federal time' falls short of evidence of vindictiveness" where "the FBI agents' threat was an attempt to encourage Lopez to assist them in the . . . gang investigation . . . ." *Id.* at 1212.

*Lopez* presents a very different situation from the one at issue here. There, the defendant never invoked his Fifth Amendment rights, and the FBI's threats were not in response to the invocation of those rights. *See id.* at 1211. Instead, the agents sought the defendant's "cooperation." *Id.* ("[The defendant] argues that . . . the federal government indicted [him] for 'noncooperation' with the FBI in its OBA gang investigation."). Further, unlike here, the agent's interview did not necessarily require the defendant to incriminate himself.[16] And, unlike here, the federal prosecutor in *Lopez* had already accepted the case for prosecution before the agent made his alleged threat. *Id.* at 1210.

Here, however, Detective Vinton made threats to Ms. Ford based on the invocation of her Fifth Amendment rights. Her invocation was necessary to protect herself against an alleged homicide that he had accused her of (even though, as the government has recently claimed, she was not an actual suspect). And the prosecutors

---

[16] Critically, *Lopez* must be read in conjunction with other constitutional rights. Although a prosecutor or agent can freely threaten a defendant with prosecution "during an interview or plea negotiations," this holding presupposes that the defendant is either represented by counsel (in the case of plea negotiations) or has knowingly and intelligently waived his or her *Miranda* rights and has submitted to a consensual interview. *See id.* Any other holding would create a complete end-run to *Miranda*.

here would never have known about Ms. Ford's gun case but for Detective Vinton's and SA Corcoran's efforts to overcome her Fifth Amendment invocation. *Lopez* has no bearing here.

## C.  This Court can find a presumption of vindictiveness.

The government also argues that this Court cannot find a presumption of vindictiveness, but that argument is not persuasive. Although courts generally owe deference to a prosecutor's pre-filing decisions, that view is based on policy rationales that do not apply here. *See United States v. Kent*, 649 F.3d 906, 913 (9th Cir. 2011). Deference is owed, for instance, because when a prosecutor first files criminal charges, the prosecutor may not have yet fully assessed the scope of charges available, so courts should not constrain that effort. *Id.* Further, requiring prosecutors to file the harshest and most serious charges immediately would prejudice defendants. *Id.* Additionally, the court recognized that "prosecutors may add charges pretrial for any number of permissible reasons, such as coming to a new understanding of the crime or evidence." *Id.* Given that defendants routinely assert pretrial rights, an expanded presumption doctrine that allowed defendants to challenge the filing of new charges anytime after asserting those rights would unreasonably restrict prosecutorial discretion and invite courts to find presumptions of vindictiveness too frequently.

These policy considerations do not apply here, where a state law enforcement officer made direct threats, the federal law enforcement officer knew about those threats, and the AUSA sought to advance the goal of those threats.

## D.  This Court should dismiss under its inherent authority.

Even if this Court declines to impute Detective Vinton's and SA Corcoran's motives to the USAO, it should dismiss under its inherent authority.

In *United States v. Chapman*, 574 F.3d 1078 (9th Cir. 2008), the Ninth Circuit affirmed the district court's dismissal of an indictment mid-trial. The court recognized that a district court may dismiss an indictment for outrageous government conduct if the conduct amounts to a due process violation. The court also recognized that, even if

the conduct does not rise to the level of due process violation, the district court may dismiss under its supervisory power. *Id.* at 1084. The Ninth Circuit has held that a district court may exercise is supervisory power "to implement a remedy for a violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991). The court later clarified that the exercise of a district courts inherent powers are not limited to these three grounds. *United States v. W.R. Grace*, 526 F.3d 499, 511 n.9 (9th Cir. 1991). And, in *United States v. Kojayan*, the Ninth Circuit held that "the judiciary—especially the court before which the primary evidence took place—may exercise its supervisory power to make clear that the misconduct was serious . . . and that steps must be taken to avoid a recurrence." 8 F.3d 1315, 1325 (9th Cir.1993); *see also United States v. Aguilar*, 831 F. Supp. 2d 1180, 1206–07 (C.D. Cal. 2011) (discussing court's authority to dismiss indictment).

This Court should exercise its inherent authority and dismiss the indictment here. Detective Vinton's actions were egregious and consistent with his long history of misconduct. His repeated and brazen violations of Ms. Ford's constitutional rights and attempt to leverage the federal judicial system to circumvent those rights warrant dismissal. SA Corcoran's decision to partake in, and failed attempts to conceal, those efforts bolster the need for dismissal, too. Dismissal will be the only effective way to "to implement a remedy for a violation of a recognized statutory or constitutional right," *Simpson*, 927 F.2d at 1090. It is the only way to "to deter future illegal conduct" by Detective Vinton and others who might feel encouraged by it. *See id.* And it is the only way "to preserve judicial integrity." *See id.* Any other decision would ratify this egregious conduct.

**E.    The Court should grant Ms. Ford's motion to compel.**

In a footnote, the government concedes that Ms. Ford "makes other serious allegations about her experiences on December 14, 2021." (Opp. at 5 n.2.) The

government, however, goes on to explain that it does not have any information in its possession to respond to those claims.  (*Id.*)  And rather than try to investigate those claims, the government asserts that "they are not relevant to the pending Motion."  (*Id.*)  Not so.  Ms. Ford's requested discovery directly relates to whether this presents an "extreme" case warranting imputation or dismissal.  That information is also relevant to determine whether Detective Vinton and SA Corcoran "prevailed upon" the USAO to file federal criminal charges and made that office his "stalking horse."  And it is relevant to Ms. Ford's selective enforcement claim.  Ms. Ford has provided thorough evidence in support of her due process and equal protection claims, and the government's disclosures have only strengthened them.  Thus, at minimum, this Court should order the government to produce discovery relating to these claims.  *See United States v. One 1985 Mercedes*, 917 F.2d 415, 421 (9th Cir. 1990); *United States v. Sellers*, 906 F.3d 848, 855 (9th Cir. 2018).

One last point.  The government has ceased its efforts to determine whether SA Corcoran provided truthful testimony—and tries to convince this Court to do the same.  But the government's unique status means it must "take all reasonable measures to safeguard the system against treachery" and perjury; no one else in this country has the power or constitutional burden to do this.  *United States v. Bernal–Obeso*, 989 F.2d 331, 333 (9th Cir. 1993).  Now that the government knows SA Corcoran's testimony is likely false, it should take serious efforts to determine the truthfulness of her claims.  *See Napue v. Illinois*, 360 U.S. 264, 269–70 (1959) (holding that a prosecutor bears a "responsibility and duty to correct what he knows to be false and elicit the truth"); *see also Shih Wei Su v. Filion,* 335 F.3d 119, 127 (2d Cir. 2003) (holding that a conviction must be set aside when the government knows or should have known a witness provided materially false testimony); *Giles v. Maryland*, 386 U.S. 66, 74 (1967) (holding the same, even when the prosecutor, "although not soliciting false evidence, allows it to go uncorrected when it appears"); *Commonwealth of N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1117–18 (9th Cir. 2001) (explaining that "[f]ew things are more

28

1  repugnant to the constitutional expectations of our criminal justice system than covert

2  perjury").

3  ### IV. CONCLUSION

4        For these reasons, Ms. Ford respectfully asks this Court to dismiss the Indictment

5  against her.  In the alternative, Ms. Ford asks the Court to compel discovery and to hold

6  an evidentiary hearing to further develop her claims.  Further, because defense counsel

7  anticipates receiving additional materials on September 6, 2022 pursuant to subpoenas

8  served on the Los Angeles Police Department, Ms. Ford respectfully requests an

9  opportunity to supplement her claims with information gleaned from those materials.

10

11                           Respectfully submitted,

12                           CUAUHTEMOC ORTEGA
                         Federal Public Defender

13

14  DATED:  September 8, 2022       */s/ Antonio Villaamil*

15                           ANTONIO VILLAAMIL

16                           WASEEM SALAHI
                         Deputy Federal Public Defenders

17

18

19

20

21

22

23

24

25

26

27

28